ESTATE OF ALLIS: HARRISON and others, Appellants, vs.
    FIRST WISCONSIN TRUST COMPANY, Trustee, and
    others, Respondents.

*January 16—October 12, 1926.*

*Trusts: Degree of care required of trustee: Investment of trust
    funds: Purchase of railroad stocks: Duty of trustee to keep
    advised as to investments: Retention of depreciating securi-
    ties: Trustee's powers of investment: How construed and
    .exercised: Discretion of trustee: How guided: Approval of
    accounts by county court: Weight of findings on appeal:
    Order approving accounts: Who bound: Minors with con-
    tingent interests: Vesting of estate: Discharge of trustee
    by beneficiary: Questions not litigated in trial court: Whether
    trustee should participate in proposed reorganization of St.
    .  Paul Railway.*

1. A trustee must exercise a high degree of fidelity, vigilance,
   and ability, especially when the trustee is a company organ-
   ized to care for trust estates, holding itself out as possessing
   a special skill in the performance of such duties and making
   an adequate charge therefor.  p. 29.
2. A trustee's judgment must be not only honest and in good faith,
   but enlightened and guided by approved rules in the invest-
   ment of trust funds, which he may not always place where
   he, or the average prudent man, would place his own funds,
   but must guard carefully and invest cautiously so that both
   principal and interest may. be forthcoming at the appointed
   time.  p. 30.
3. In the absence of express statutory authority, a trustee is not
   authorized to invest trust funds in any form of stock.  p. 31.
4. A statute making certain stocks a legal investment for trust
   funds did not relieve the trustees in this action from the duty
   of exercising the degree of diligence and prudence required
   of trustees in determining whether to continue an investment
   in stock already made.  p. 31.
5. A trustee prudently investing trust funds must still keep him-
   self informed of the value of the security and the pecuniary
   responsibility of the obligor, see that the interest is paid with
   reasonable promptness, and take notice of all those things
   affecting the investment which a man of fair judgment, care,
   and prudence would take and consider in the matter of a
   loan of his own money.  p. 31.

6. The fact that trustees under a testamentary trust continued to hold preferred stock of the St. Paul Railway Company after the statute permitting the investment of trust funds therein was repealed, until it had greatly depreciated in value, makes a *prima facie* case of failure to exercise reasonable diligence. p. 32.

7. In determining the liability of trustees for depreciation in the value of stock, the administration of the trust estate must be viewed in the light of their powers under the will as well as the duties and liabilities imposed by law. p. 32.

8. Trustees are not exempt from the strict rules that ordinarily define their duties and responsibilities without a clear and unequivocal statement of such intent by the creator of the trust in the instrument creating and evidencing it. p. 33.

9. Even under a will clearly and unequivocally conferring the broadest discretionary powers on trustees, it is their duty to exercise a reasonable and not an arbitrary discretion, and to execute the trust according to the laws governing trustees with like powers. p. 33.

10. In this case the accounting of the trustees is *held* to present issues of fact requiring an affirmance of the findings of the court, supported by proof that they acted in good faith, as ordinarily prudent persons would act, according to their best judgment, in retaining the stock in which trust funds were invested until it had greatly depreciated in value. p. 33.

11. This court does not weigh the evidence on appeal as if it were sitting as a trial court, and will not disturb the findings of the trial court unless they are contrary to the great weight and clear preponderance of the evidence. pp. 33, 34.

12. The will, which granted to the trustees full power to invest the estate, and continue it "as . . . invested at the time of my [testator's] death, . . . or to change such investment," is *held* to authorize them to purchase certain railroad and electric railway and light stocks. p. 34.

13. An order of the county court approving and allowing the accounts of the trustees, entered with the express consent of the beneficiary, disposes of all questions as to the investment in stocks the purchase of which was detailed in the accounts. p. 34.

14. Under testator's will, which gave the beneficiary of the trust estate the absolute power to dispose of it by will, her minor children will have no vested interest therein until she dies intestate or leaves a will making them her heirs. p. 34.

15. A receipt given by testator's only child, after his widow's death, for half of the stock in which the trust funds were invested, and an order of the county court approving and allowing

the trustees' accounts with such child's consent, completely discharged them from liability for loss by depreciation in the value of the stock so transferred.  p. 34.

16. In determining whether the findings of the county court that the trustees acted in good faith as ordinarily prudent persons, according to their best judgment, in retaining the stock in which trust funds were invested until it had greatly depreciated in value, are supported by the evidence, this court must view the situation as it should have appeared to vigilant trustees at the time of deciding to retain it.  p. 35.

17. The finding of the county court that the trustees, in retaining the St. Paul stock in which the trust funds were invested, on the recommendation of an investigating committee composed of men of large experience and undoubted financial ability, were not liable for depreciation in the value thereof, is *held* sustained by the proof, though the committee was mistaken in its recommendation.  p. 36.

18. The retention by the trustees of stock which paid dividends regularly and which was a safe long-time investment, purchased as authorized by the will and the law, does not render them liable for depreciation in the value thereof.  p. 37.

19. The evidence is *held* to sustain a finding that the trustees had difficulty in securing possession of certificates of stock owned by testator at the time of his death, and that they had used due diligence and made persistent efforts to obtain them.  p. 37.

*On rehearing:*

20. The estate of the minor appellants is *held* not to be vested because their mother, who is entitled to the income, is also given the absolute power of disposing of all of the trust estate by will and the minors will not receive any of the estate unless she dies intestate, and because her heirs at law were not ascertainable at the time of the creation of the trust, at which time the minors were not in being.  pp. 60–62.

21. The question whether the trustee should participate in the reorganization of the St. Paul Railway not having been tendered to nor litigated by the county court, this court is in no position to pass upon it.  p. 62.

CROWNHART, J., dissents.

APPEAL from a judgment of the county court of Milwaukee county: M. S. SHERIDAN, Judge. *Affirmed.*

The will of Ernest Allis devised and bequeathed all of his estate, except his home and its contents, in trust to his

mother and three brothers and a personal friend and to their successors in trust. The will granted to the trustees "full power and authority in their discretion to invest, reinvest and employ said estate and generally manage the same; to continue the same as it is invested at the time of my death—and especially as invested in the E. P. Allis Company, or to change such investment." All of the trustees named in the will resigned, and the Milwaukee Trust Company, which subsequently became the *First Wisconsin Trust Company*, and John W. Barr were appointed trustees in November, 1901.

During the years 1907 to 1910 the trustees purchased 1,150 shares of the preferred stock of the Chicago, Milwaukee & St. Paul Railway Company at prices that averaged about $161 a share and 750 shares of the preferred stock of the Milwaukee Electric Railway & Light Company at the average price of about $112 a share.

At the time of his death practically the entire estate of the testator located in Wisconsin consisted of stock of the E. P. Allis Company. In May, 1901, the property of the E. P. Allis Company was sold to the Allis-Chalmers Company in return for stock of the Allis-Chalmers Company. The contract of sale provided that all shares received by the E. P. Allis Company should be held in one certificate and remain undistributed until November, 1902. The trustees did not obtain possession of the certificate for the shares belonging to the trust estate until October, 1903.

Upon the death of the widow of Ernest Allis, a one-half interest in the trust estate vested in the only child of the testator, *Margaret Allis Harrison.* She then received one half of all of the stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company which had been purchased by the trustees, and gave a receipt discharging both Barr and the *Trust Company* "from all further liability, past, present, and future, in regard to the one half

of said trust funds aforesaid." Following the giving of this receipt and upon the express written consent of *Mrs. Harrison,* the county court entered an order discharging Barr and the *Trust Company* "from further liability as to the one half of said estate assigned to *Margaret Allis Harrison.*"

In January, 1920, Barr resigned and William B. Harrison, husband of *Margaret Allis Harrison,* was appointed trustee. At that time Barr and the *Trust Company* petitioned the court to allow their accounts. These accounts credited the trustees with the full amount paid for the stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company. *Mrs. Harrison* consented in writing that this petition be heard without notice and that the relief prayed for in the petition be granted. Thereafter, based on such consent, on August 11, 1920, the county court entered an order approving and allowing these accounts.

The proof established the fact that the market value of the stock of the St. Paul road had greatly depreciated since it was purchased by the trustees and that the road has paid no dividends on its stock since 1917; that the stock of the Milwaukee Electric Railway & Light Company is selling below par, but that the company has continued to pay dividends on its stock regularly, and that the Allis-Chalmers stock depreciated in value between the time that the E. P. Allis Company plant was sold and the time when the trustees finally secured the stock belonging to the trust estate.

Soon after his appointment as a co-trustee in January, 1920, Mr. Harrison began urging the *Trust Company* to sell the St. Paul stock, calling attention to the declining market. In January, 1922, the *Trust Company* appointed a special committee to consider and recommend action with reference to the stock of the St. Paul road held by it as trustee in various estates. After investigation of published data as to the affairs of the St. Paul road and after conferences

with men who were "intimately and responsibly familiar" with the property and obligations of the road, this special committee, by its report in June, 1922, recommended "that it would not be expedient to dispose of either the common or preferred stock of the Chicago, Milwaukee & St. Paul Railway Company at this time. The officers of the *Trust Company* will, of course, continue to keep in constant touch with the market and consider and advise with the board of directors upon such developments in the market and in attending conditions as shall from time to time take place." Again in December, 1923, this special committee after similar investigation reported its recommendation that it would not be expedient to dispose of either the common or the preferred stock of the St. Paul road.

In March, 1924, the *Trust Company* filed its petition in the county court asking that its accounts be approved and that it be discharged from all liability in connection with the administration of the trust estate or the investment of the trust funds. The beneficiary, *Margaret Allis Harrison,* and the guardian *ad litem* of her four minor children objected to the approval of the accounts and asked that the *Trust Company* be charged with the loss sustained by the trust estate because of the depreciation in the value of the stock of the Allis-Chalmers Company, the St. Paul road, and the Milwaukee Electric Railway & Light Company. The county court approved the accounts and entered a judgment discharging the trustees from all liability on account of the administration and management of the estate. From that judgment this appeal was taken.

For the appellant *Margaret Allis Harrison* there were briefs by *Lines, Spooner & Quarles* of Milwaukee, attorneys, and *James Quarles* of Milwaukee and *W. Pratt Dale* of Louisville, Kentucky, of counsel, and oral argument by *Mr. James Quarles* and *Mr. Dale.*

For the minor appellants there was a brief by *John C. Albert* of Milwaukee, guardian *ad litem*.

For the respondent *First Wisconsin Trust Company* there was a brief by *Miller, Mack & Fairchild,* and oral argument by *Paul R. Newcomb* and *Edwin S. Mack,* all of Milwaukee.

On behalf of John W. Barr, Jr., there was a brief by *Van Dyke & Hauxhurst* of Milwaukee, and oral argument by *Douglass Van Dyke.*

The following opinion was filed June 21, 1926:

STEVENS, J.   A trustee occupies a position of peculiar responsibility.   A trustee is selected because of confidence in his diligence, prudence, and absolute fidelity, as well as in his ability to so administer the trust as to protect those who, through infancy or other cause, are not able to protect their own interests.   The performance of the duties of a trustee requires the exercise of a high degree of fidelity, vigilance, and ability.   Especially is this true when the trustee is a company organized for the purpose of caring for trust estates, which holds itself out as possessing a special skill in the performance of the duties of a trustee, and which makes a charge for its services which adequately compensates it for a high degree of fidelity and ability in the administration of a trust estate.

Wisconsin early adopted the rule that trustees must exercise more than ordinary diligence and vigilance in the management of a trust estate.   *Hutchinson v. Lord,* 1 Wis. 286, 309.   Good faith alone in making an investment will not protect a trustee.   *Simmons v. Oliver,* 74 Wis. 633, 636, 43 N. W. 561.   A trustee must also exercise diligence, prudence, and absolute fidelity.

This state has consistently adhered to the strict rule with reference to the liability of trustees early adopted in New

York, rather than to the more liberal rule adopted in Massachusetts. The law requires of a trustee "more than good faith and honest judgment." It requires that the judgment of the trustee be

" 'enlightened and guided by the approved rules applicable to the investment of trust funds, not to his uninformed, personal judgment, exercised without reference to legal rules and principles. . . . He must always bear in mind that he is dealing with trust funds, which were not given him to be used in developing or furthering business enterprises, but to be guarded carefully and invested cautiously, so that principal, as well as interest, may be forthcoming at the appointed time. While he must be as diligent and painstaking in the management of the trust estate as the average prudent man is in managing his own estate, he may not always place the trust funds where he, or the average prudent man, would place his own funds.' . . . The trustees are bound to act in good faith and exercise a sound judgment and prudent discretion in making an investment." *Pabst v. Goodrich,* 133 Wis. 43, 73, 74, 113 N. W. 398.

"This necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made. It therefore does not follow, that, because prudent men may, and often do, conduct their own affairs with the hope of growing rich, and therein take the hazard of adventures which they deem hopeful, trustees may do the same; the preservation of the fund, and the procurement of a just income therefrom, are primary objects of the creation of the trust itself, and are to be primarily regarded." *King v. Talbot,* 40 N. Y. 76, 86.

When a trust fund "passes into the hands of a trustee, it comes impressed with a double duty: first, to so invest it that it can be turned over at the expiration of the trust period without loss; and second, to secure an income therefrom. He must act honestly and faithfully, and in what he believes to be the best interest of the *cestui que trust.* He must exercise a sound discretion. He is bound to proceed

with diligence in investigating the nature of the proposed investment, and to use such care in deciding as, in general, prudent men of intelligence and integrity in such matters employ in their own affairs when making a permanent investment, in which the primary object is the preservation of the fund, and the secondary one that of obtaining an income therefrom. He must not permit himself to take the hazard of an investment with the hope of largely increasing the fund, as he might, perhaps, do in the prudent management of his own estate. The entire element of speculation must be removed. He must at all times remember that he is handling a trust fund, the care of which has been intrusted to him in reliance on his integrity, fidelity, and sound business judgment. . . . A trustee has not unlimited authority to invest as an ordinarily prudent man would invest his own; he must take such risks only as an ordinarily prudent man would take who is a trustee of the money of others. . . . He must always bear in mind that the primary object of the creation of the trust is not, ordinarily, accumulation, but the preservation and perpetuity of the fund until the time for its distribution arrives; and he must make no investment by which this object may be at all likely to be defeated." *In re Buhl's Estate,* 211 Mich. 124, 178 N. W. 651, 12 A. L. R. 569, 574.

In the absence of express statutory authority a trustee is not authorized to invest trust funds in any form of stock. But at the time the trust fund here in question was invested in the stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company, these stocks were by express statute made a legal investment for trust funds. But this statute did not relieve the trustees from the duty of exercising the degree of diligence and prudence required of trustees in determining whether this stock should be continued as an investment for these trust funds.

"It is not by a prudent investment alone that a trustee performs his whole duty in regard to a trust fund. He is still bound to be watchful, keep himself informed as to whether or not a depreciation in the value of the security is taking place from any cause, to see that the interest is

paid with a reasonable degree of promptness, to keep himself informed as to the pecuniary responsibility of the obligor, and in fine to keep himself informed and take notice of all those things affecting the investment which a man of fair judgment, care, and prudence would take and keep in consideration in the matter of a loan of his own moneys." *In re Stark's Estate,* 15 N. Y. Supp. 729, 731.

The fact that the trustees continued to hold the stock, especially the stock of the St. Paul road, after the statute permitting the investment of trust funds in such stock had been repealed and until the stock had so greatly depreciated in value, makes a *prima facie* case of failure to exercise reasonable diligence on the part of the trustees which calls for explanation. *Beam v. Paterson S. D. & T. Co.* 81 N. J. Eq. 195, 197, 86 Atl. 369, 370.

In determining the liability of the trustees, the administration of the estate by the *Trust Company* must be viewed in the light of the powers conferred upon the trustees by the will as well as in the light of the duties and liabilities imposed by the well established rules of law to which attention has been directed. By the broad powers given the trustees by his will the testator has taken the case out of the strict rules that ordinarily define the duties and responsibilities of trustees by vesting in them very broad powers as to the investment of the funds of the trust estate. In construing the will now before the court in *In re Allis's Estate,* 123 Wis. 223, 229, 101 N. W. 365, this court said:

"The will grants the trustees 'full power and authority in their discretion to invest . . . and employ said real estate and generally manage the same; to continue the same as it is invested at the time of my death—and especially as invested in the E. P. Allis Company, or to change such investments.' The powers thus conferred are of the broadest kind, and are to be exercised by the trustees, in their discretion, in the execution of the trust. The purpose of the testator, manifested in this and other provisions of the will, evidently was to have the trustees invest and employ the

*corpus* of the estate in obtaining securities in kind like those specified in the will; and he contemplated that they should purchase such securities as a prudent and provident person would purchase as good and safe investments, and that they should not be restricted to the conditions and limitations imposed by law for the investment of trust funds."

It is the rule that trustees are not to be exempt from these strict rules "without a clear and unequivocal statement of intention to that effect made by the maker of the trust in the instrument creating or evidencing it." *Babbitt v. Fidelity Trust Co.* 72 N. J. Eq. 745, 758, 66 Atl. 1076, 1081. But the will of Ernest Allis contains such clear and unequivocal statement of an intent to confer the broadest kind of powers upon the trustees to be exercised in their discretion in the execution of the trust. But even under the broad powers conferred it was the duty of the trustees to exercise a reasonable and not an arbitrary discretion, to execute the trust in accordance with existing laws governing trustees under like powers in the execution of their trust. *Pabst v. Goodrich,* 133 Wis. 43, 72, 113 N. W. 398.

The county court found that the trustees acted in good faith and as ordinarily prudent persons would act with reference to the retention of the stock here in question and that the trustees exercised the discretion vested in them by the will in accordance with their best judgment and in the manner that seemed to them to be for the best interests of the trust estate. Were it not for the broad powers conferred by the will the court would find it difficult to affirm these findings of the county court. But with the broad powers granted the trustees, the court is satisfied that the case presented issues of fact upon which the findings of the trial court must be affirmed, as they are supported by a preponderance of the proof, although it is strongly urged that there is sufficient proof to sustain a finding of liability on the part of the *Trust Company.* This court does not

weigh the evidence on appeal as if it were sitting as a trial court. It will not disturb the findings of the trial court unless they are contrary to the great weight and clear preponderance of the evidence.

Under the broad powers conferred by the will, the trustees were authorized to purchase stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company. These stocks were no more speculative than those of the E. P. Allis Company, in which the great bulk of the estate was invested at the time of the testator's death. They were "securities in kind like those specified in the will." The propriety of the investment of so large a part of the trust estate in the stock of the St. Paul road or of the Milwaukee Electric Railway & Light Company is not before the court for determination at this time, because the order entered by the county court on August 11, 1920, approving and allowing the accounts of the trustees effectually disposes of all questions as to the investment in these stocks and effectually estops *Mrs. Harrison* from raising any question as to the purchase of these stocks by the trustees. The order of the county court, entered with the express consent of *Mrs. Harrison,* is conclusive upon these questions. *In re Menzie's Estate,* 54 Misc. 188, 192, 105 N. Y. Supp. 925, 927.

The minor appellants have no vested interest in the trust estate. They will never have a vested interest in this trust estate unless their mother dies intestate or makes them her heirs by will, because the mother has the absolute power to dispose of all the trust estate by will in such manner as she may elect.

The trustees are not liable for any loss which may have been sustained on one half of the stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company which was transferred to and accepted by *Mrs. Harrison* after her mother's death. The receipt given by *Mrs. Harri-*

*son* and the order of the county court entered upon her express consent completely discharged the trustees from all liability for one half the amount of the trust funds which were invested in the stock of the St. Paul road and of the Milwaukee Electric Railway & Light Company.

If the trustees were liable, these orders would relieve the *Trust Company* of all liability because of the original purchase of the stock of the two railway companies or because of the failure to sell that portion of the stock which was transferred to *Mrs. Harrison.* These orders effectually dispose of all questions with reference to the purchase or retention of the stock of these two railway companies except the liability of the *Trust Company* to repay to the estate the loss sustained through the depreciation in value of the stock which is still held by the trustees.

In determining whether the findings of the county court are supported by the evidence we must view the situation as it should have appeared to vigilant trustees during the years when they were charged with the responsibility of deciding what should be done with this stock. We can now see that it would have been wiser to sell the stock. But in judging the trustees' acts we should put ourselves in their position at the time. The trustees were considering the question, not whether they should invest in this stock, but whether they should sell the stock upon a falling market. The evidence shows that the *Trust Company* in good faith made investigations, sought information from trustworthy sources, and acted upon such information according to its best judgment.

The determination of the question whether to sell on a declining market is always a difficult one. It was a difficult task to attempt to forecast the value of railroad stocks during the years when the World War so completely unsettled all values. In determining that trustees were not

responsible for the loss sustained by a trust estate through the decrease in the price of St. Paul railway stock held during the period of declining values, the New York court said:

"The general conditions in this country were most extraordinary. The railroads were taken over by the federal government, and it was a matter of common thought for a time that their securities would appreciate in value under that system. I think it would be unreasonable to hold a trustee liable for retaining such securities under such conditions in the hope of a better market, when it was authorized by the terms of the trust to make such an investment originally." *Matter of U. S. Trust Co.* 189 App. Div. 75, 80, 178 N. Y. Supp. 125, 128.

The *Trust Company* appointed a special committee of seven men who are generally recognized as men of large experience and undoubted ability in financial affairs who sought all available information as to the condition of the St. Paul road and the value of its stock. After extended investigations this committee made two reports to the *Trust Company* in which it recommended that the stock of the St. Paul road be retained. The fact that the committee was mistaken in its recommendations does not lead to the conclusion that the findings of the trial court are not sustained by the proof. " 'The law does not hold a trustee responsible for errors in judgment when he has been careful to enlighten that judgment.' " *Pabst v. Goodrich,* 133 Wis. 43, 73, 113 N. W. 398. There is no proof that the committee was not acting in good faith and exercising its best judgment in making its investigations and its recommendations or that the *Trust Company* was not acting in good faith and exercising its best judgment when it followed the recommendations of its special committee and retained the stock of the St. Paul road. Under such circumstances it must be held that the findings of the county court as to liability for investment in the St. Paul stock are sustained by the proof.

The trial court found that the investment of the trustees in the stock of the Milwaukee Electric Railway & Light Company was authorized by the will; that it was made in accordance with the powers and duties conferred upon the trustees by the will, and that there was no breach of duty on the part of the trustees in retaining this investment. These findings are fully sustained by the evidence. Dividends have been paid upon this stock regularly. The proof shows that the stock is a safe and remunerative long-time investment which was a legal investment for trust funds at the time that the stock was purchased.

The proof also sustains the finding of the county court that the trustees had great difficulty in securing the stock of the Allis-Chalmers Company which belonged to the estate, and that they exercised diligence and were persistent in their demands to get possession of the stock. A careful study of the facts satisfies the court that the trustees were in no way to blame for delay in securing the stock. It follows that there is no liability on the part of the trustees because of their failure to secure this stock at an earlier date.

The appellants will pay the fees of the clerk of this court. No other costs will be taxed.

*By the Court.*—Judgment affirmed.

The following opinion was filed July 26, 1926:

CROWNHART, J. (*dissenting*). I am impelled to dissent from the opinion of the court in this case, not because I disagree with rules laid down as to the duties of trustees in carrying out their trust, but because of the application of those rules to the facts of the case.

Ernest Allis died testate on November 9, 1894, a resident of the city of Milwaukee, leaving surviving him his widow, Penelope W. Allis, and a daughter, *Margaret W. Allis,* his only child. The will of Ernest Allis was ad-

mitted to probate in the county court of Milwaukee county
on January 3, 1895, and in accordance with the nomination
made in said will, Margaret W. Allis, mother of the de-
ceased, William W., Charles, and Louis Allis, brothers of
the deceased, and Alex P. Humphrey, a personal friend of
deceased, were duly appointed and qualified as executors and
trustees under said will.

Shortly thereafter Mr. Humphrey, a resident of Louis-
ville, Kentucky, resigned as such executor and trustee, and
his resignation was accepted by the county court.

On November 15, 1901, the remaining executors and
trustees named in the will of the deceased resigned and
their resignations were duly accepted by the county court.

On November 22, 1901, the Milwaukee Trust Company
and John W. Barr, Jr., were duly appointed and qualified
as executors *c. t. a. de bonis non* and trustees under the
will. The *First Wisconsin Trust Company,* the respondent,
later succeeded the Milwaukee Trust Company. John W.
Barr, Jr., resigned as trustee on January 29, 1920, and
William B. Harrison, the husband of *Margaret Allis Harri-
son,* the appellant, was appointed his successor on January
31, 1920.

*Margaret W. Allis,* daughter of the decedent, became
twenty-one years of age on March 11, 1912, and on June
4, 1912, she married William B. Harrison, co-trustee with
the respondent. *Margaret W. Allis* has by her husband,
William B. Harrison, four minor children, represented in
these proceedings by a guardian *ad litem.*

Among other provisions, the will of Ernest Allis, de-
ceased, conferred powers on the trustees as follows:

"1. To sell, mortgage, or lease said real estate, convey
or exchange the same; convert the realty into personalty or
personalty into realty; and so to do with any and all part
of said estate; granting to them full power and authority
in their discretion to invest, reinvest, and employ said estate

and generally manage the same; to continue the same as it is invested at the time of my death,—and especially as invested in the E. P. Allis Company, or to change such investments; to receive and collect such profits and income thereof and to dispose of the net income as follows:

"2. To pay to my beloved wife, so long as she shall remain unmarried, one half of said net income if I shall leave a child or children; or all of said net income if I shall leave no children. From the date of her marriage—if she shall contract another one—she shall receive, during her life, one third of such net income; provided that if at such date none of my descendants are then surviving, and none of them have attained the age of twenty-one or married, she shall receive, during her life, the whole of such net income.

"3. To pay to Mrs. Kate P. Winston of Louisville, Kentucky (the mother of my said wife), during such period of her life as shall survive my wife's life, on the first day of each and every three months, the sum of two hundred and fifty ($250) dollars.

"4. The remaining net income shall, so long as my wife remains my widow, be turned over to her to be used by her for the liberal education of my children during their minority, and to and for her and their comfortable maintenance and support; and the said trustees shall, at the request of my wife, in addition to the said net income, use so much of the principal of the said estate as shall, with such net income, equal the sum of eight thousand ($8,000) dollars."

These provisions of the will were construed by this court in *In re Allis's Estate,* 123 Wis. 223, 229, 101 N. W. 365, where it was held:

"The powers thus conferred are of the broadest kind, and are to be exercised by the trustees, in their discretion, in the execution of the trust. The purpose of the testator, manifested in this and other provisions of the will, evidently was to have the trustees invest and employ the *corpus* of the estate in obtaining securities in kind like those specified in the will; and he contemplated that they *should purchase such securities as a prudent and provident person would purchase as good and safe investments, and that they should not*

*be restricted to the conditions and limitations imposed by law for the investment of trust funds."*

Responding to the suggestions of the court in that case, the legislature, by ch. 317, Laws of 1903, provided that, except where it was otherwise expressly directed by the will or instrument of trust, a trustee might invest trust funds in governmental and real-estate securities, as provided by law, and also might, under the direction and with the approval of the court, invest trust funds in bonds of certain states therein named.   It also provided that the trustee might invest trust funds in bonds of any city or village in the state of Wisconsin, or any city in the states named having a population of 25,000 or over, provided that such city or village shall not have defaulted in the payment of any of its bonded indebtedness during the ten years immediately preceding.   It was further provided that the trustee might invest in the mortgage bonds or preferred stock of any steam railway or railroad corporation in the United States owning and operating not less than five hundred miles of track, which had paid dividends upon its entire capital stock for ten years immediately preceding such investment; and it might invest in promissory notes, which might be amply secured by the pledge of any of the bonds, stocks, or securities in which the investments were authorized.   It was further provided that nothing in said act should be construed to affect the power or jurisdiction of any court of the state of Wisconsin in respect to trusts and trustees.

The act was amended in 1905 by adding to the last paragraph the following: "nor to affect any powers or authority as to investments conferred by will or other instrument of trust."

The law was further amended in 1909 by ch. 462 of that year, but not as affecting any of the securities referred to in this case.

The law was again amended by ch. 536, Laws of 1915, in several particulars, among others the following:

"2. However, the proportion of any one trust fund that may be invested by an executor, guardian or trustee in notes, bonds or other securities in which investment is authorized by this section, the value of which is dependent upon the same persons, firms, associations of public or private corporations, shall be subject to limitations as follows:

"(a) . . .
"(b) . . .
"(c) . . .
"(d) When it exceeds fifty thousand dollars, twenty per cent. thereof."

By sec. 4 of that chapter it was provided:

"Nothing in this act contained shall affect any investment made prior to the enactment hereof or affect any rights or interests established, accrued or created thereunder or affect any suit or action pending when this act becomes effective."

The statutes have been several times amended since then (sec. 231.32, Stats. 1925), but not as affecting the securities herein in issue. As has been seen, the will in question conferred the broadest kind of powers upon the trustees, but the court said that the testator "contemplated that they should purchase such securities as a prudent and provident person would purchase as good and safe investments." In other words, the will, by express language, gave to the trustees larger powers in regard to the kind of investments they might make than would be permissible without such express language in the will, as this court had formerly held in the case of *Simmons v. Oliver,* 74 Wis. 633, 43 N. W. 561, but the trustees were still required to exercise judgment and prudence in the purchase of such securities, in that they should be *good and safe investments.*

Necessarily, trustees are clothed with power and charged with the duty to invest and keep safely and productively invested the funds of the trust, in such property and se-

curities as are recognized as appropriate for trust funds or are authorized by the trust' instrument.   26 Ruling Case Law, 1305; 39 Cyc. 391.   The duty to keep well and safely invested is not discharged merely by keeping the estate invested in such real and personal property as shall be least subject to deterioration or loss, without reference to the production of an income; if kept in that form, it may be said to be safely, but not well, invested.   The duty imposed on the trustees is, obviously, to keep the estate, real and personal, invested in such way as not only to be safe, but so as to make it productive of at least a reasonable income. 26 Ruling Case Law, 1305.   Trustees are bound to employ such diligence and prudence in the care and management as, in general, prudent men of discretion and intelligence in such matters employ in their own like affairs.   26 Ruling Case Law, 1306; 39 Cyc. 406.   What constitutes the care and diligence thus exacted depends on the attendant circumstances.   It is not to be understood by the rule that, wherever loss ensues from an investment of the trustee, he will be excused by showing that persons of care and prudence, in the management of their own affairs, made investments of the same character and were disappointed in the result.   A prudent man, dealing with his own means, might employ them in speculations or doubtful investments promising large gains.   If a trustee should, however, so loan, or engage in such enterprises, at the expense of the interests committed to his charge, he could not claim excuse by pointing to the course of individuals, noted for their prudence, by whose example he had been misled.   The rule necessarily excludes all speculation, all investments for an uncertain and doubtful rise in the market, and, of course, everything that does not take into view the nature and object of the trust, and the consequences of a mistake in the selection of the investment to be made.   26 Ruling Case Law, 1307.

By the interpretation given by this court to the will, *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365, which is the law of this case, the trustees undoubtedly could invest in stocks and bonds, but they would not be excused from using care, diligence, and wise discretion in making such investments, nor in the control or management of such securities as they shall have purchased thereafter. Not only must care, diligence, and discretion be used in the purchase of securities, but the same care, diligence, and discretion must be used in the management of the estate throughout; and if reasonable care and discretion should require the sale of such securities and the reinvestment of funds secured from such sale in other securities or other classes of securities, it would be the manifest duty of the trustees to make the sale. *Johns v. Herbert,* 2 App. Cas. D. C. 485; *Hutchinson v. Lord,* 1 Wis. 286; *Pabst v. Goodrich,* 133 Wis. 43, 72, 113 N. W. 398; *Carrier v. Carrier,* 226 N. Y. 114, 125, 123 N. E. 135, 138; and *In re Stark's Estate,* 15 N. Y. Supp. 729, 731, where it is said:

"It is not by a prudent investment alone that a trustee performs his whole duty in regard to a trust fund. He is still bound to be watchful, keep himself informed as to whether or not a depreciation in the value of the security is taking place from any cause, to see that the interest is paid with a reasonable degree of promptness, to keep himself informed as to the pecuniary responsibility of the obligor, and in fine to keep himself informed and take notice of all those things affecting the investment which a man of fair judgment, care, and prudence would take and keep in consideration in the matter of a loan of his own moneys; and likewise to take all lawful prudent means with a fair degree of promptness to recover the debt, and prevent a loss coming to the estate."

1 Perry on Trusts (6th ed.), § 465, states the rule this way:

"If a testator gives any directions in his will to continue his investments already made, trustees must of course fol-

low such directions; and if they follow them in good faith, they will not be liable for any losses, unless they are negligent in failing to· change an investment, when it ought to be changed to save it; for it cannot be supposed that the direction of a testator to continue a certain investment relieves the trustees from the ordinary duty of watching such investment, and of calling it in when there is imminent danger of its loss by a change of circumstances."

And in *Johns v. Herbert, supra,* at p. 499, it is said:

"It was his [the trustee's] duty to watch the investment with reasonable care and diligence, and to apply to the court promptly for leave to change it whenever his judgment, as a prudent business man, should have prompted thereto."

This was said when the investment had been made by the testator himself. In this connection it should be noted that ch. 317, Laws of 1903, permitting investments in certain railroad stocks and bonds, especially provided that "Nothing herein contained shall be construed to affect the power or jurisdiction of any court of the state of Wisconsin in respect to trusts and trustees," and this provision has been written in the statutes ever since. Thus the trustees were free to submit doubtful questions as to their investments to the proper court at any time, for advice and direction.

The rule announced in *In re Allis's Estate,* 123 Wis. 223, 101 N. W. 365, is further considered and limited in *Pabst v. Goodrich,* 133 Wis. 43, 72, 74, 113 N. W. 398. After citing and approving other authorities the court said:

"Many other cases might be cited in support of the doctrine above enunciated. There can be no doubt, under a power broad as the one under consideration, that the trustees are bound to act in good faith and exercise a sound judgment and prudent discretion in making an investment. They are bound to look to the interests of the remainderman

as well as to those of the life tenant, *and place the trust estate in no hazardous position.*"

They are equally bound to watch their investments and use care, caution, and sound judgment in rescuing their investment from hazards that may appear after the investments have been made. This results from their general duty to prudently and safely manage the estate.

Also see *Babbitt v. Fidelity Trust Co.* 72 N. J. Eq. 745, 755, 66 Atl. 1076, 1081; *Matter of Jarvis,* 110 Misc. 5, 18, 180 N. Y. Supp. 324, 331; *Villard v. Villard,* 219 N. Y. 482, 114 N. E. 789; *Beam v. Paterson S. D. & T. Co.* 81 N. J. Eq. 195, 86 Atl. 369.

Less care and diligence is required of the trustees in holding securities in which the testator himself had invested and which come to the trustees as a part of the estate. *Bowker v. Pierce,* 130 Mass. 262; *Green v. Crapo,* 181 Mass. 55, 62 N. E. 956; *Bartol's Estate,* 182 Pa. St. 407, 38 Atl. 527.

And, generally, on the duties of trustees in the management of estates, see note to *Willis v. Braucher* (79 Ohio St. 290, 87 N. E. 185), 44 L. R. A. N. S. 873.

Between April 29, 1907, and February 9, 1910, the trustees invested $64,143.91, approximately fourteen per cent. of the entire estate, in 750 shares of six per cent. preferred stock of the Milwaukee Electric Railway & Light Company. The par value of this stock was $100, and the trustees paid an average of $112 per share. The stock had paid its preferred dividends promptly without any default, its business has been prosperous, and at the time of the hearing it was more prosperous than ever. It is a public utility subject to regulation by Wisconsin law. The stock at the time of the trial was quoted at somewhere around 84. The explanation of this low price of the stock is that the market for this security is rather narrow, and

that it fluctuates with local conditions. After the war the company issued other securities at a higher rate of interest, which became a better investment and by comparison depreciated the six per cent. preferred stock.

The trial court found that the investment of the trustees in preferred stock of the Milwaukee Electric Railway & Light Company was authorized by the will, was made in accordance with the powers and duties conferred upon the trustees by the will, and there was no breach of the powers and duties conferred upon the trustees in retaining this investment. I think this finding of the trial court may be sustained. But in considering further investments in stocks, the fact of this large investment in stock of a somewhat speculative nature should not be overlooked.

Between April 30, 1907, and February 3, 1910, the trustees bought for the estate 1,150 shares of the preferred stock of the Chicago, Milwaukee & St. Paul Railway Company, and paid therefor $185,506.25, being an average of about $161 per share, the par value being $100 per share. The last two purchases of stock were made on February 3, 1910,—400 shares at $167¾ and 50 shares at $167⅞.

The purchase of this stock was authorized by statute (ch. 317, Laws of 1903) if such investment would be "good and safe," and only if "good and safe."

The Chicago, Milwaukee & St. Paul Railway Company was a Wisconsin corporation, with headquarters at Milwaukee. It covered a territory that was very compact. The road had been successful in its business for many years. It had paid dividends on its preferred stock since its organization, and on its common stock since 1892. The dividend yield was $7 per share, which would make the average yield on the purchase price about 4¼ per cent., but on the last two purchases the yield would be only about 3.6 per cent.

Owing to the small yield on the investment, the high price paid, the large amount of this stock already held in

this road and in the street railway company, and the future prospects of the road, it is plain that these purchases of February 3, 1910, were dangerous and speculative, which the trustees had no right to make. On this point the appellants cite the testimony of George Miller, a director and legal adviser of the trust company. He testified:

"*Q.* We are asking, however, as to your opinion concerning the advisability of that. *A.* My opinion would always be that I would properly distribute my investments.

"*Q.* Would you or not consider the investment of about as much as 30 %, or approximately 30 %, of one estate in the securities, preferred stock, of the St. Paul Railroad Company, a wise investment for a trustee to make or not? *A.* Well, as I understand it, whether I would advise it, you mean?

"*Q.* Yes. *A.* Well, I wouldn't advise it.
"*Q.* You wouldn't? *A.* No, sir."

In *Appeal of Davis,* 183 Mass. 499, 67 N. E. 604, the trustees had invested $12,000 out of an estate of $30,000 in the stocks and bonds of the Santa Fe Railroad, and the court held the amount excessive. The powers of the trustees under the will were even broader than in the instant case. There the court said (p. 502):

"The will contains no direction as to the securities in which the trustees are to invest. That matter is left to their judgment and discretion, and we think that in such a case the general rule applies, and that they are bound to exercise a sound judgment and a reasonable and prudent discretion. . . . We agree with the judge of the probate court in thinking that the words [above quoted] are enabling words, inserted to give to the trustees the power to deal fully and expeditiously with the estate, and that they do not release the trustees from the obligation to exercise a sound judgment and a reasonable and prudent discretion in regard to such investments as they may make under the authority given them."

This case is illuminating and squarely in point. It is supported by other decisions there cited.

It should again be pointed out that this court did not, in its construction of the will, relieve the trustees from the exercise of sound judgment and discretion. The court said: ". . . He [testator] contemplated that they [the trustees] should purchase such securities as a *prudent* and *provident person would purchase as good and safe investments. . . .*"

Before February 3, 1910, the trustees had invested $110,012.50 of the estate—more than one sixth of the whole—in the preferred stock of the Milwaukee road. On that day they invested $75,493.75 in such stock at the high price of $167¾ and $167⅞, and at the low yield of 3.6 per cent. How can this last purchase be defended on any theory of safe investment?

When the first purchase of the stock was made, the road was doing a profitable business in a compact territory, was easily managed, and had a long experience of successful operation. From 1907 to 1911 the road was extended from the Missouri river to the Pacific coast, about 2,200 miles of track, and that extension changed entirely the character of the road and required different management. The extension required a very large increase in the capital stock and bonded indebtedness of the road. The outstanding common stock at the commencement of the extension was $58,000,000 and the preferred stock was $49,000,000, but by the time the extension had been completed the stock had been increased to $233,000,000. At the time the building of the extension was commenced the outstanding bonds were $117,000,000, and by the time the road was finished the bonds outstanding were $410,000,000. This extension had to compete directly with two old established roads for transcontinental business—the Northern Pacific and the Great Northern. More than that, the Panama Canal, begun in 1904 and finished in 1914, would furnish another competing transportation facility in the same territory. The

road failed to earn the anticipated revenues after it was completed, and it did not earn sufficient to pay its bonded interest charges and its preferred dividends.   These had to be paid partly out of the surplus before 1917, at which time dividends on stock were stopped and no dividends paid thereafter.

Many of the facts later developed should have been anticipated.   It was known when this investment was made that the Panama Canal was well under way and soon would furnish active competition for the Pacific coast.   The history of railroad extensions through the Rocky Mountains to the coast should have sounded a warning against the stock of the Milwaukee road being a safe investment in view of its proposed extension.   It is a matter of common knowledge, especially with financiers, that most former ventures of the kind had resulted disastrously to stockholders.   Even at the time it was testified that Congress was reacting unfavorably to railroads generally, and several were in financial embarrassment.   Between 1910 and 1917 the Chicago & Eastern Illinois, the St. Louis & Southwestern, the Rock Island, the Erie, and the New Haven railroads got into financial difficulties which resulted in receiverships, and were notable examples where stockholders had lost enormously.   There was nothing to commend the stock of the Milwaukee road for safe investment after it was known that it was venturing on such a great undertaking as proposed.   It is difficult to understand how a great trust company, claiming to be expert in safe financial investments, could feel secure in buying a large block of stock at a price that would yield so little and chance so much.   Then the history of railroads in the past should have caused them much concern.   Receiverships under such conditions had been numerous and disastrous to stockholders.

In *Appeal of Dickinson,* 152 Mass. 184, 25 N. E. 99,

decided in 1890, after laying down the general principle applicable to trust investments, the supreme court of Massachusetts said:

"The experience of recent years has perhaps taught the whole community that there is a greater uncertainty in the permanent value of railroad properties in the unsettled or newly settled parts of this country than was anticipated nine years ago. Without, however, taking into consideration facts which are now commonly known, and confining ourselves strictly to the evidence in the case and the considerations which ought to have been present to the mind of the appellant when, in May and August, 1881, he made the investments in the stock of the Union Pacific Railroad Company, we think it appears that he acted in entire good faith, and after careful inquiry of many persons as to the value of the stock and the propriety of the investments. We cannot say that it is shown to our satisfaction that the trustee so far failed to exercise a sound discretion that the investments should be held to be wholly unauthorized. Still, it must have been manifest to any well-informed person, in the year 1881, that the Union Pacific Railroad ran through a new and comparatively unsettled country; that it had been constructed at great expense, as represented by its stock and bonds, and was heavily indebted; that its continued prosperity depended upon many circumstances, which could not be predicted, and that it would be taking a considerable risk to invest any part of a trust fund in the stock of such a road. In this case the whole trust fund appears, by the first account, to have been $16,260.05. On May 9, 1881, the trustee bought thirty shares of the stock of the Union Pacific Railroad Company at $119 per share, which with commissions amounted to $3,573.75. This is an investment of between one fourth and one fifth of the whole trust fund in this stock, and is certainly a large investment relatively to the whole amount of the trust fund, to be made in the stock of any one corporation. After this, on August 16, 1881, he purchased twenty shares more at $123 per share, amounting with commissions to $2,475. The last investment we think cannot be sustained as made in the exercise of a sound discretion. While we recognize the hardship of compelling a trustee to make good out of

his own property a loss occasioned by an investment of trust property which he has made in good faith and upon the advice of persons whom he thinks to be qualified to give advice, we cannot on the evidence hold that the trustee was justified in investing in such stock as this so large a proportional part of the property."

The *Dickinson Case, supra,* was followed in 1903, in the same court, by *Appeal of Davis,* 183 Mass. 499, 67 N. E. 604, where the court said:

"The trust estate consisted of a fund of $30,000 bequeathed by the testator to the trustees in trust to invest the same and pay over the income to the testator's daughter during her life, and upon her death to distribute and pay over the principal to and amongst her children. From 1883 to 1887, inclusive, the trustees invested in the stock and bonds of the Atchison, Topeka & Santa Fe Railroad Company upwards of $12,000 of the trust funds, as follows: On January 15, 1883, they purchased $2,000 of the six per cent. sinking-fund bonds issued by that company, and secured by mortgage bonds of various railroad companies whose lines formed a part of the Atchison System. On December 11, 1885, they purchased five shares of the stock; on December 24, 1886, forty-five shares of stock; on February 17, 1887, six shares of the stock; on June 18, 1887, $5,000 collateral trust bonds issued by it, and secured by mortgage bonds of various railroads; and on December 28, 1887, two shares of the stock. Prior to the last purchase of bonds and the last two purchases of stock, between a quarter and a fifth of the trust property had been invested in the stock and bonds of the company. The probate court disallowed the last purchase of bonds and the last two purchases of stock, and allowed the other investments. In *Appeal of Dickinson,* 152 Mass. 184, 25 N. E. 99, 9 L. R. A. 279, where the facts in regard to the situation of the corporation whose stock was purchased were very similar to the facts in this case, the decision was, in effect, that so much of the investment as was in excess of a quarter to a fifth of the whole trust fund could not be sustained as made in the exercise of a sound discretion. The court declined to say that the trustee had so far failed to exercise a

sound discretion that the investments should be held to be wholly unauthorized, but disallowed them in part.   We do not see how this case can be fairly distinguished from that; the fact that the investment was partly in stock and partly in bonds of the company not being sufficient, it seems to us, to distinguish it."

The trustees claim that the investment appeared to them perfectly safe—an excellent investment.   They certainly took a rosy view of the situation owing, perhaps, to their close relations with Mr. Earling, manager of the Milwaukee road, who was very excessively optimistic over the prospects of his road.   But it cannot be said that they were not warned of the experience of other transcontinental roads and the probabilities of a like experience by the Milwaukee road.   One of the directors and legal adviser of the trust company testified:

"There was a lot of 'buzz' around in those days.   I might say that people talked, that every transcontinental railroad, every railroad that had been extended to the Pacific coast, after it was extended went into bankruptcy; that every road was ruined that tried to build a Pacific extension.   I would hear him [Earling] tell his views of that kind of stuff."

And yet the trustees, having common knowledge of these facts, would have us believe the purchase in 1910 was a "good and safe" investment.

The increase in main-track mileage of the road from 7,266 in 1909 to 9,424 in 1913 was only 2,158 miles, or 29 %, but the mortgage indebtedness from $115,767,500 to $290,554,754, excluding bonds held in the treasury, was $174,872,254, or more than 100 % during the same period. This could have been foreseen in February, 1910.   The trustees of this estate were not authorized to speculate with the funds under their control.   Their imperative duty was to safeguard the *corpus* of the estate, even though the returns on investment should be low.   Business men may speculate with their own funds for prospective high profits,

but trustees must not yield to such temptation.  The trustees had not even the excuse of large returns—they were promised only 3.6 % on their investment, and for this they were required to take very large risks of losing the principal.

I think the trustees certainly should be held negligent in making the investment of February 3, 1910, for the reason that it was not a safe investment for trust funds, and because the large proportion of the funds invested was contrary to well-recognized business principles.

The appellants further contend that the trustees were negligent in not disposing of the stock of the Milwaukee road when it became apparent that the same was depreciating in value and was in fact unsafe and speculative.  I think that the investment of February, 1910, was an improper investment and that the trustees are liable for the loss thereon.

Conceding that the first purchase of railway stock in 1907 of about $110,000 was a proper investment when made, yet as the road progressed with its Western extension a new situation confronted the trustees.  The whole character of the road was being changed.  From a compact territory, well developed and prosperous, it had entered into an unknown and speculative venture.  It was crossing the Rocky Mountains through a very expensive territory to build, which was uninhabited for many hundreds of miles and uninhabitable.  It was changing the road from a well-proven and prosperous business to an uncertain and doubtful venture in transcontinental transportation.  The result of the value of the stock was soon apparent.  It decreased in the market almost continually from 1910 down to 1925. The interest on the bonded indebtedness increased during all this time.  The general trend of the net earnings was downward.  In two years prior to 1915 there was a net loss.

In 1915 the legislature, by ch. 536, dropped out of the law permission for trustees to invest in railroad stocks.  It rec-

ognized the dangers of such investments and changed the public policy of the state.   While this did not affect investments already made, it should have acted as a challenge and a warning to the trustees to re-examine their investment and make sure that it was safe, and if it was in fact deteriorating and apparently unsafe it was their duty to dispose of the stock.

The trustees claim that they had faith in the ability of the road to come back and to ultimately prosper.   But faith alone is not sufficient to justify the action of the trustees concerning this investment.   It has been seen that they must be guided by the law, and that they must exercise prudence and discretion in the care and maintenance of their investments.   They must use that care and prudence which trustees would ordinarily use under the same circumstances.

The trustees seek to excuse themselves by saying that the war changed the whole situation, and that they were not required to and did not anticipate the war.   It is by no means shown that the war was the cause of the disaster to the stockholders of the Milwaukee road; indeed it may well be argued that the World War was an aid and assistance to the road during the three years prior to our entry into the war.   It is a matter of common knowledge that during that time railroads generally were more prosperous than at any other time in their history.   The World War brought into the United States a flood of new business, and transportation was at its height.   Upon our entry into the war the roads became so blockaded with business that they were unable to transport for the government its necessary requirements.   The government thereupon took over the railroads under an agreement to pay the railroads a return equal to the average of the three preceding years—profitable years.   The government complied with this agreement, made its payments, and did more,—it loaned this road a large sum of money, and the road is still the government's debtor.   The government returned the roads under the

Transportation Act, which guaranteed the roads a reasonable income and gave them greatly increased rates. However, the Milwaukee road, as has been shown, had a tremendous outstanding bonded indebtedness. Some of these bonds would be coming due presently, and the road would have no money to pay the bonds.

In 1920 Mr. Harrison was substituted as trustee for Mr. Barr. Mr. Harrison represented his wife, the chief beneficiary. He immediately made an investigation of the condition of the Milwaukee road and became firmly convinced that the investment was unsafe. He seems to have been well advised. He urged his co-trustee to sell the stock,— to no avail. About this time one of the directors and legal adviser of the *Trust Company,* a very wealthy and influential business man, who held a block of the stock of this road, sold his stock. He testified that he sold it to establish a loss in making his income tax returns. It is apparent that that was not his only reason, because the loss would be established as soon as the sale was made, and he could have repurchased the next day and held the stock as an investment at the price current, if he thought it a good investment, but he did not repurchase.

The *Trust Company* responded to Mr. Harrison's urgent request to sell by appointing a committee of their directors to investigate the whole subject. This committee investigated the matter at two different times and made two separate reports, each time reporting that it was preferable not to sell the stock. It will be noted by an examination of the committee's reports that the committee was not concerned alone with the investment of the Allis trust funds, but they had a very large amount of other trust funds invested in the Milwaukee road; and they were considering all of these trust funds in making their report.

In considering this phase of the case, of course it is necessary to keep always in mind that we are to look at the action of the trustees from their point of view at any par-

ticular time in which they were required to act. It is said by the *Trust Company* that the fact that the stock was gradually going down on the market would not necessarily indicate that at any particular time it would be advisable for the trustees to sell. It is said that, whatever the market price, there must be buyers who believed the purchase would be a profitable investment or they would not buy, and for the same reason the holder of the stock may consider that the investment is profitable or there would not be persons seeking to invest at the price. I do not think there is much in this argument. The market price spoken of is the one quoted on the New York Stock Exchange. Business men generally do not regard that price, in and of itself, a safe guide for investment. To a very large extent the Exchange maintains a speculative market, and stocks often rise and fall on the market within wide ranges within a short time, whereas the assets back of the stocks may remain entirely unchanged. It was the duty of the trustees to investigate the assets and the probable earnings of the road as a going concern. The dividends were stopped in 1917, and none have since been paid. Prior to that time and subsequent to 1910, the dividends had been partially paid out of surplus. On the whole, it appears with certainty that at some point between February, 1910, and the time of this application in the county court to confirm the report of the trustees, disposition of the stock of the Milwaukee road should have been made.

I think that time should have been in 1911, when the president of the respondent testified that the purchase of the stock was no longer desirable. One of the excuses for purchasing the stock in the first place was that railroad stock was not taxable, while trust property generally was locally taxed as personal property. This excuse did not hold for putting so large a proportion of the estate in this

one stock, for there were other stocks—telegraph, telephone, and express companies, for example—that were not taxable. But the desire to escape local taxation was accomplished in 1911, when the Income Tax Law was passed. At this time the market price of the railroad stock was going steadily down. The high cost of the road was a demonstrated fact. The heavy bond issues had been made. And the president of the respondent sensed the danger. Certainly the stock should have been sold no later than 1915, when the legislature took notice of the dangerous character of railroad stocks for trust investments by changing the law. The legislature did more. It provided that not more than twenty per cent. of a trust fund exceeding $50,000 should be invested in any one security. Here was a suggestion and a warning to reduce the holdings in the railroad stocks as well as to get out altogether. But still respondent hung on. The World War was on, and business, including that of railroads, in the United States was prosperous, although for the St. Paul road well-informed men saw plainly that as the day approached nearer and nearer when bonds would become due, there would be grave danger of default. There came a time when we entered the war, and the government took over the railroads and paid them on the basis of the three prosperous years preceding. The war ended, and the government turned the roads back vastly improved and under a guaranty of rates high enough for a fair return on the investment. And yet the St. Paul road kept on the slide, slipping day by day, and the respondent professed to believe the stock would come back notwithstanding the day for paying bonds was coming closer and there were no funds with which to pay, and notwithstanding the co-trustee was urgently demanding a sale of the stock while yet it had some value. Still the respondent was obdurate and the crash came. Through negligence the

trustees had purchased stock at an exorbitant price; they had purchased it in the face of probable disaster; they had purchased it at a price which would not pay a reasonable return on the purchase price; they held the stock when the reason for the purchase had ceased to exist; they held it after the legislature had found it a bad policy to invest trust funds in rail stock; they held on when the market value was steadily falling day by day, month by month, and year by year; and finally, when Barr, co-trustee in the disastrous enterprise, had resigned, and the husband of the beneficiary had succeeded Barr, the respondent trustee persistently refused to sell the stock, notwithstanding the repeated urgent requests of the co-trustee to do so. At no time did respondent ask the advice of the court until failure was all but complete. Here we have culpable negligence at the beginning, terminating in wilful negligence at the end.

Under such circumstances, other courts, as we have seen, have been less solicitous for the trustees and more considerate of the objects of the testator's bounty.

Under correct legal principles, trustees for hire should be treated as bailees for hire or sureties for pay. They should be held to strict accountability for their trust. They hold themselves out to the public as specially skilled in financial matters. They solicit trust funds, promising exceptional skill and ability in handling such funds and in caring for beneficiaries under wills. I do not think it can be said that the respondent has responded in any fair degree to its duty in the premises.

How, then, does this court discharge the respondent from its liability? It holds the beneficiary estopped from claiming her rights under her father's will because it is said she consented to an order discharging Barr, co-trustee. If estopped at all, it can only be as to her claims against Barr, which would be only equitably as to one half of the loss.

The respondent has suffered no more, and estoppel is based on some wrong committed by the party estopped which otherwise works an injury to the party sought to be charged. But I think there can be no estoppel applied to the beneficiary in such circumstances. To do so is to disregard the terms of the trust and to hold the *cestui que trust* responsible for the obligations imposed on the trustee. That disregards the very purpose of the trust. In creating the trust the testator deemed the widow and orphan incompetent to manage the estate. He therefore placed his faith in the trustees he named and in the supervisory power of the courts. He placed his estate beyond the power of his widow or his daughter to dissipate through their inexperience or improvidence. By applying the rule of estoppel, the court circumvents the terms of the trust and the will of the testator. The will did not permit the beneficiaries to squander the estate, and the court should not permit the trustees to do so under cover of consent of the beneficiaries. The court finds one lone precedent for this holding, and that a surrogate court of New York.

Again, it is suggested that the beneficiary is bound on the principle of *res adjudicata*. The respondent, from time to time, filed its account with the county court, but in these accountings it carried the stocks in question at their cost so that it always appeared that there had been no loss. This did not present a true state of facts. The burden is on the trustee to fully and fairly account for its trust. It never did so. On such a statement and a joint petition of respondent and Barr, Barr was discharged, but there was no application to discharge the respondent. The court accepted the account for the purpose of discharging Barr. There was no hearing on the account and no accounting made other than a schedule of the assets without a true valuation. Only the cost price was entered on the schedule. And it was to

this petition that the beneficiary, the appellant here, consented. Nothing more. The order of the court was that Barr be discharged from further liability. It must be remembered that this order was entered on a joint petition of the trustees and without an accounting in fact. It is only fair to respondent to state that when it filed its petition in this proceeding it made no contention that a full accounting of its trust had ever been made in August, 1920. On the contrary, respondent asked the county court to allow its account for the full period of its trusteeship.

Moreover, there are minor children of *Mrs. Harrison,* who were not made parties to the August, 1920, proceedings. It is said by the court that they have no interest in the matter because *Mrs. Harrison* has the power by will to dispose of the estate to others than her natural heirs. But this seems to disregard the purpose of the will to preserve the estate through the trust, and testator relied, no doubt, upon the natural relation between parent and child to provide for the heirs of his daughter.

But, in any event, I feel assured that it is bad law and a perversion of justice to hold that a beneficiary shall be bound by an improvident consent to a false account, by which she is indirectly permitted to dissipate her estate, while in law and in fact she is incapable of exercising any control over the estate whatever.

For these reasons I respectfully dissent.

The following opinion was filed October 15, 1926:

PER CURIAM (*on motion for rehearing*). The will of Ernest Allis so clearly expresses the testator's intent that the children of *Mrs. Harrison* should not take a vested estate that the citation of authority to support the proposition that "the minor appellants have no vested interest in the trust estate" is not deemed necessary. The will in clear and

unequivocal language expresses the testator's intent that *Mrs. Harrison* shall have the absolute power to dispose by will of all the trust estate in which her children could ever take any estate or interest under the will of Mr. Allis.   That power remains with *Mrs. Harrison* until the last moment of her life.   Until the death of *Mrs. Harrison* it cannot be determined whether these children inherit any part of the trust estate under and through the provisions of the will of Ernest Allis.   By the terms of the will it is "as and when" any of the testator's children die intestate that that child's portion of the trust estate passes to the heirs at law of the deceased child of the testator.   The will contains no other provision under which these minor appellants can ever inherit any part of this trust estate under the will of Ernest Allis.   No estate passes and no interest vests in the heirs at law of any of testator's children until—that is "as and when"—any child of the testator dies intestate.   In order that an estate may vest there must be some person in being in whom the estate can vest.   At the time of the creation of the trust estate the minor appellants were not in being.   Manifestly no estate could then vest in the unborn children of a daughter who was unmarried at the time that the trust estate was created.

Rules for the judicial construction of wills are to be resorted to only when uncertainty arises as to the meaning of the language used in the will.

"Various rules have been laid down by the courts as helpful in the construction of uncertain clauses in wills.   None of them are inflexible, however, and all yield to the cardinal rule that the words of a will are to be construed so as to give effect to the intention of the testator, which intention is to be ascertained from the language of the will itself, in the light of the circumstances surrounding the testator at the time of its execution." *Will of Ohse,* 137 Wis. 474, 476, 119 N. W. 93.   See, also, *Will of Prasser,* 140 Wis. 92, 94, 95, 121 N. W. 643.

The provisions of this will are so plain and unambiguous that testator's intent can be ascertained without resort to these rules.

"The real meaning of the instrument is the sovereign guide, and, since every will differs in some respects from every other, it is a familiar principle that precedents and rules of construction are less helpful than in construing other writings which, owing to statutes or custom, are far more uniform.    Said Judge Story in 1832 in discussing the construction of wills: 'The cases almost overwhelm us at every step of our progress; and any attempt even to classify them, much less to harmonize them, is full of the most perilous labor.'    *Sisson v. Seabury,* 1 Sumn. 235, 239.    The difficulties have been by no means diminished by the innumerable volumes of the law reports which have since been added to our legal literature."    *Will of Griffiths,* 172 Wis. 630, 634, 635, 179 N. W. 768.

The estate of these minor appellants was and still is contingent and not vested, because the event upon which this trust estate is to be paid over to the children of *Mrs. Harrison*—that is, the death of *Mrs. Harrison* intestate—was and now is uncertain and may never happen; and further because the heirs at law of *Mrs. Harrison* were then not ascertainable, because they were not in being at the time of the creation of this trust estate.

Appellants urge that this court should determine whether the stock of the Chicago, Milwaukee & St. Paul Railway should be deposited for the purpose of participating in the reorganization of the company.    The judgment appealed from directed the trustees to hold the stock until the further order of the court.    So far as the record discloses, the county court has never been asked to consider or pass upon the question of whether the trustee should participate in the reorganization of the St. Paul railroad.    The record does not disclose the terms of the reorganization agreement. This court is in no position to pass upon the question of whether the trustee should participate in the reorganization

because that issue was neither tendered to nor litigated by the county court. *Lee v. Pauly Motor Truck Co.* 179 Wis. 139, 146, 190 N. W. 819.

No other question presented by appellants' brief warrants. the granting of a rehearing or requires further consideration.

*By the Court.*—The motion for rehearing is denied, with $25 costs.