ABRAMS, Guardian, Respondent, vs. UNITED STATES FIDELITY & GUARANTY COMPANY, imp., Appellant.

*February 26—March 20, 1906.*

*Guardian and ward: Collection and disposition of ward's funds: Employment of attorney: Interest, from what date computed: Discretion: Trial: Stipulation as to evidence: Lodging and personal service by guardian to ward: Accounting: Annual rests: Appeal: Prejudicial error: Costs.*

1. It is the duty of a guardian, as trustee of the funds of his ward, on receiving such funds, to keep them for his ward, and to invest so much of them as is not required for immediate and necessary use as soon as he can do so with reasonable diligence.

2. In performing such duty he can employ an attorney to collect the ward's funds, but when the guardian has received them the functions of the attorney are ended, and if the guardian then places the funds in the attorney's hands to invest, the attorney becomes simply an agent to whom the guardian has delegated his duties as trustee.

3. Where a guardian employed an attorney to collect his ward's es-

tate, and the amounts so collected were represented by checks or drafts payable to the guardian, which the guardian indorsed and handed back to the attorney for investment, and the attorney afterwards defaulted, on an accounting the guardian is properly charged with such amounts.

4. In such case when the drafts came to the guardian's hands he came into the possession of so much of his ward's estate, and his personal duty to manage that part of the ward's estate then began.

5. The question as to the time from which a guardian shall be charged with interest on the funds of his ward, lost through the negligence of the guardian, is a matter resting in the sound discretion of the trial court in view of all the facts.

6. Where a guardian had neglected his duty as to his ward's funds and made no attempt to invest them, it is no abuse of discretion to charge the guardian with interest thereon, commencing two months from the receipt of part of the funds and three months upon the balance.

7. Where no application is made to the trial court to be relieved from a stipulation that a guardian received a sum of money belonging to his ward at an agreed date, and that no testimony should be received in conflict with the stipulation, it must be held to control on appeal.

8. Where a guardian voluntarily stood *in loco parentis* to his wards and never intended to charge them anything for lodging or personal services, on an accounting neither the guardian nor his surety has any right to credit therefor.

9. In an accounting by a guardian annual rests should be made, the amounts expended for the preceding year deducted, and interest computed on the balance up to the next annual rest; but where the method adopted was more favorable to the guardian—in allowing him interest on his disbursements from a period midway between the time of his appointment and the time of his resignation,—it is not prejudicial error on the guardian's appeal.

10. In an action by a successor guardian to compel the former guardian to account, it is not error to allow costs against a surety who appeared in and defended the action.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Affirmed.*

This is a proceeding to settle the final account of Sarah Perry as the guardian of the estate of certain minors. The appellant was a surety upon the guardian's bond, and was

made a party to the proceedings in the county court, and appealed from the order of that court settling the guardian's account to the circuit court, where the matter was again tried and the account settled, and from that judgment the surety appeals to this court. There was little substantial dispute as to the facts. It appeared that Herbert D. Avery and his wife, Ida, resided in Colorado, where Ida died December 4, 1899, leaving four small children, Bessie, Perry, Alois, and Marie, the minors in question, and about December 20, 1899, Sarah Perry, a sister of the deceased, went to Colorado and brought the children to her home in Winnebago county, in this state, to live with her, under an arrangement with the father that the father was to pay what he could for their keeping; that the father afterwards sent on various sums for this purpose, amounting to $330 in all; that the father was killed in a railroad accident on the Colorado & Southern Railway October 18, 1900, leaving the four children as his only heirs at law; that Sarah Perry was appointed guardian of the persons and estate of the minors by the county court of Winnebago county December 4, 1900, and gave a guardian's bond in the sum of $8,000, with the appellant as surety; that the guardian at once employed one Herbert L. Sweet, then an attorney of good standing in Oshkosh, as her attorney; that at the time of Avery's death he had two policies of life insurance, one in the Independent Order of Foresters, of $3,000, and one in the Ancient Order of United Workmen, of $2,000, both being in favor of his heirs; that he also left some property in Colorado, which was afterwards administered upon, the net amount realized being $482.98; that there was also an unsettled claim against the railroad company for the death of said Herbert; that the mother, Ida, left forty acres of land in Winnebago county, title to which passed to the minors; that Miss Perry, as guardian, put the various claims into Sweet's hands for collection, and that under authority from the county court of Winnebago county a settle-

ment was arranged by Sweet with the railroad company of the death claim on the basis of the payment of $1,250. Miss Perry, as guardian, signed a receipt and release for this claim, and Sweet sent the same to the railroad company, and a check for $1,250 was returned to Sweet. There was no direct evidence as to whether this check was payable to the guardian or to Sweet. The court found, however, that it was payable to Miss Perry and was indorsed by her and turned over to Sweet. The claim against the Independent Order of Foresters was also collected by Sweet, the draft being sent to him, payable to the order of Miss Perry, who indorsed the draft and signed the receipt and returned both draft and receipt to Sweet. The guardian testified, and the court found, that she left these drafts in the hands of Mr. Sweet for investment, and that the same course was pursued with the sum of $482.98 collected from the administration of Avery's estate in Colorado. It appeared without dispute that Sweet immediately deposited the drafts in each case to his own credit in the bank. The sum of $2,000 from the Ancient Order of United Workmen was paid to Miss Perry in cash, and she kept $1,000 thereof, and took the other $1,000 to Sweet and left it with him to invest. Sweet returned to Miss Perry $200 out of the $1,250 received from the railroad company, but did not return any other sums. He claimed that he had invested the money in real-estate mortgages, and to deceive Miss Perry made some payments to her of sums which he claimed to have received as interest on the investment, but he never turned over to her any securities, and in fact used the moneys himself as soon as he received them, and left the city in the spring or summer of 1902, leaving many thousand dollars of liabilities, including his liability to the guardian. Miss Perry made no effort at any time by suit to obtain the moneys or the securities from Sweet. She made no charge at any time against the infants for care, lodging, or food, but kept accurate account of the moneys expended for clothing, school

books, and other incidentals. She testified that she never intended to charge them for care or lodging, and the court found that she stood in the relation of parent to them. In the account, as settled by the circuit court, the guardian was charged with the sums received from the insurance companies, the railroad company, and from the estate in Colorado, with interest on such sums at six per cent., commencing two months from the receipt thereof upon part of the sums, and three months upon the remainder. She was also charged with the payments made to her by Sweet as interest, and with $108 received from the forty-acre farm as rent. She was credited with the sums which she paid for taxes and repairs upon the real estate, also with the sums paid for clothing and incidentals paid for the minors, and with the premiums paid for her bond. She was allowed $50 as a reasonable amount for legal services, and $1,450 for food furnished to the minors from December 20, 1899, to February 20, 1904, less $330 received from the father. She resigned as guardian of the estate of the minors February 20, 1904, and the respondent *Abrams* was appointed to that trust, and this accounting was thereafter had.

For the appellant there was a brief by *Thompson, Thompson & Pinkerton,* and oral argument by *J. C. Thompson.*

*Carl D. Jackson,* for the respondent.

WINSLOW, J. The guardian was a trustee of the funds of her wards. It was her duty, on receiving such funds, to keep them for her wards, and to invest so much of them as was not required for immediate and necessary use, as soon as she could do so with reasonable diligence. She could employ an attorney to collect them, and, if she exercised reasonable care and prudence in the choice of an attorney, doubtless she would be protected from losses occurring by the fraud or negligence of the attorney in the course of his duty as collecting agent; but when she had received the funds by draft or in cash

the functions of the attorney for collection ended, and if she then placed the fund in his hands to invest he became simply an agent to whom she had attempted to delegate her duties as trustee.   Mr. Lewin, in his work on Trusts (vol. 1, p. 252), says:

"Trustees who take on themselves the management of property for the benefit of others have no right to shift their duty on other persons; and if they do so they remain subject to the responsibility towards their *cestuis que trustent* for whom they have undertaken the duty.  If a trustee, therefore, confide the application of the trust fund to the care of another, whether a stranger, or his own attorney or solicitor, or even co-trustee or co-executor, he will be held personally responsible for any loss that may result."

This principle is firmly established.   It does not mean that a trustee may not employ a broker or attorney to do those things which in the ordinary course of business such agents would be employed to do, but simply that he cannot delegate to others the doing of those things which he is in duty bound to do himself.   The collection of claims against others involving actions at law or negotiations for settlement may well be intrusted to an attorney.   The guardian has not undertaken to act as an attorney, but the care and investment of the funds which reach his hands is one of the very things which the guardian has agreed to attend to, and if he delegates this duty to another, whether he be an attorney or a layman, he makes such other his personal agent and is responsible for his acts.   A guardian's duty, by the terms of his appointment, is "to dispose of and manage" his ward's estate according to law, and such is the tenor of his bond.   He may employ attorneys or agents according to the usual course of business to reduce the estate to possession and to protect it, but when once in his hands his personal duty to dispose of and manage it begins, and this duty is not to be delegated.

These considerations really dispose of the most serious question raised by the appellant in this case, namely, the

question whether the guardian should be charged with the sums received from the railroad company, the Order of Foresters, and the administrator of Avery's estate in Colorado. The claim is that these sums never, in fact, came to the hands of the guardian, but were squandered by the attorney in the process of collection. The court found, upon sufficient evidence, that these amounts were represented by bank drafts or checks payable to the order of the guardian, which came to the guardian through the attorney, and that the guardian indorsed them and handed them back to the attorney, to be invested by him for her as guardian. It must be held that, when the draft came to her hands, she came into possession of so much of her ward's estate. Her personal duty to manage that estate then began. It is claimed that interest should not have been charged upon the funds which came to the guardian's hands prior to the expiration of six months from the time of their receipt. This is a matter resting in the sound discretion of the trial court in view of all the facts. The court allowed about two months upon a part of the funds, and three months upon the balance, during which time no interest was charged. The fact being that the guardian absolutely neglected her duties and made no attempt to invest the funds, we cannot say that there was any abuse of discretion. *In re Thurston,* 57 Wis. 104, 15 N. W. 126. Interest was charged on the sum of $482.98, received from the estate of Herbert D. Avery, from April 1, 1901, and it is claimed that the testimony shows that this amount was not actually received until November, 1901. There was certainly testimony to this effect, but by the stipulation of facts in the case it was expressly stipulated that the sum was received about February 1, 1901, and that no testimony should be received in conflict with the stipulation. 'As no application was made to the trial court by the appellant to be relieved from the stipulation, it must be held to control.

It is contended that the court should have allowed the

guardian a reasonable sum for lodging of the children and for her personal services in their care. The fact was that she voluntarily stood *in loco parentis* to these children and never intended to charge them anything for lodging or services. Under these circumstances neither the guardian nor the surety has any right to such credit. *Hudson v. Jenson,* 110 Wis. 26, 85 N. W. 689. The court allowed the guardian interest on her disbursements at six per cent. per annum from a period midway between the time of her appointment and the time of her resignation. This was not the proper plan of accounting. Annual rests should have been made, and the amounts expended for the preceding year deducted, and interest computed on the balance up to the next annual rest; but, as the result of the method adopted by the court is more favorable to the appellant, there was no prejudicial error. *In re Thurston, supra.* The allowance of costs in the circuit court is complained of, but no reason is perceived why such action was not strictly right.

*By the Court.*—Judgment affirmed.