WILL OF MUELLER: MUELLER (HAROLD P.), Appellant, v. MUELLER (JEAN) and others, Respondents.
IN RE MUELLER INTER VIVOS TRUST: SAME, Appellant, v. SAME, Respondents.

*June 1—June 25, 1965.*

28

For the appellant there were briefs by *Michael, Best & Friedrich* and oral argument by *Kenneth K. Luce,* all of Milwaukee.

For the respondent Jean Mueller there was a brief by *Gibbs, Roper & Fifield,* attorneys, and *Thomas B. Fifield* of counsel, all of Milwaukee, and oral argument by *Thomas B. Fifield.*

For the respondents Elizabeth Mueller Ellis and Robert W. Mueller there was a brief by *Churchill, Duback & Smith* of Milwaukee, and oral argument by *Paul H. Duback.*

For the minors and unborn or presently unascertainable persons there was a brief and oral argument by *Allen N. Rieselbach* of Milwaukee.

WILKIE, J. Three major issues are presented on this appeal:

1. Did the trial court err in determining that the co-trustees had a duty to diversify the single asset of the trusts, the Worthington stock, and that this duty was breached by the failure to sell in October or November of 1961?

2. Are the beneficiaries of the trusts estopped from making any claim against appellant?

3. Is appellant entitled to indemnification or contribution from his cotrustee as to any part of the amount of his surcharge on the two testamentary trusts?

### Diversification of the Trusts.

The trial court concluded first that the trustees should have diversified the investments of the three trusts within a reasonable time after October 18, 1958, when the THIRD and FOURTH article trust accounts were approved, and second, that the trustees should have disposed of 80 percent of the Worthington stock in October or November of 1961.

We first consider the trustees' duty to diversify.

A basic rule of trust administration is that a trustee should diversify investments so as to minimize the risk of loss. The Restatement, 1 Trusts (2d), p. 541, sec. 228, provides:

"Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary to distribute the risk of loss by a reasonable diversification of investments, unless under the circumstances it is prudent not to do so." [1]

---

[1] Sec. 228 of 3 Scott, Trusts (2d ed.), p. 1707, likewise states: "DISTRIBUTION OF RISK OF LOSS. The trustee should exercise prudence in diversifying investments so as to minimize the risk of

Appellant first turns to the terms of the trust instruments and argues that the trustees had the power, under these instruments, to retain the Worthington common stock. However, the *inter vivos* trust instrument did not authorize the retention of any stock whatsoever and only Mueller common stock could have been retained under the express terms of the article THIRD and FOURTH trusts.[2]

As to both the article THIRD and FOURTH trusts the will provided:

"[Article FIFTH] (c) Said trustees may in their discretion participate in and make any payments required by any proceedings for the reorganization, refinancing, dissolution, or other transactions, including the acquisition of stock rights when offered, *and may accept substituted or distributed stocks and securities,* in respect of any corporate securities subsisting in said trusts." (Emphasis added.)

Article 6 of the *inter vivos* trust contained an identical provision. Thus the trust instruments authorized the acceptance of substitute stock (Worthington), but contained no express authorization to retain the substituted stock.

While there is no express provision authorizing the trustees to retain the substituted stock, if the Worthington stock was substantially equivalent to Mueller, the trustees under both the article THIRD and FOURTH trusts (but in no event under the *inter vivos* trust) could have retained the Worthington stock once it was received in the exchange

large losses. He should not therefore invest more than a reasonable proportion of the trust estate in a single security, or, it would seem, in a single type of security. This is a commonplace among experts in the art of making investments. . . ." See also Bogert, Trusts & Trustees (2d ed.), p. 414, sec. 612.

[2] Article THIRD, par. (5) and article FOURTH, par. (a) (4) contain identical provisions authorizing "my said trustees to retain among the assets of said trust estate all of the stock of said L. J. MUELLER FURNACE COMPANY, with express authority to purchase additional common stock of said corporation."

for Mueller.[3] But as appellant himself admitted, Worthington was a considerably different corporation in terms of size, variety of products, and ownership. Accordingly, the stocks were obviously different and it cannot be seriously contended that the stocks were substantially equivalent.

As a further contention in support of his position that the express terms of the testamentary trust instrument (as distinguished from the *inter vivos* trust instrument) authorized the trustees to hold onto the Worthington stock, appellant cites another provision of the will, to wit article FIFTH, par. (b), which provides:

"My trustees *shall have power in their discretion* to take, receive, hold, administer, collect, *invest, and reinvest the assets of said trust estates,* with full power to bargain, sell, and convey at such prices and upon such terms as to them may seem best, or to exchange or otherwise realize upon any or all of the assets of said trust estates *as and when said trustees, in their discretion, deem it advisable. . . ."* (Emphasis added.)

Relying on *In re Allis's Estate,*[4] *Estate of Allis,*[5] and *Welch v. Welch,*[6] appellant contends that this language, while not specifically sanctioning retention of the substituted stock, was broad enough to have permitted the trustees to do

[3] Restatement, 1 Trusts (2d), p. 553, sec. 231, comment *f;* 3 Scott, Trusts (2d ed.), p. 1740, sec. 231.4, which states in part: "SUBSTITUTION OF NEW SECURITIES. Where a trustee is authorized to retain certain securities but is not authorized to purchase similar securities, and owing to a merger or other change in the corporate organization new securities are issued in place of the old securities, the question arises whether the trustee can properly receive and retain the new securities. It has been held that he can properly do so if the new securities are substantially equivalent to the old ones. On the other hand, if the new securities are substantially different from the old ones the trustee is under a duty to sell them. . . ."

[4] (1904), 123 Wis. 223, 101 N. W. 365.

[5] (1926), 191 Wis. 23, 209 N. W. 945, 210 N. W. 418.

[6] (1940), 235 Wis. 282, 290 N. W. 758, 293 N. W. 150.

so without regard to any statutory limitations. In these three cases, this court held that where sweeping powers are given in regard to investing and reinvesting the trust assets, the trustees are not bound to comply with specific statutory limitations on retention of particular investments. But even with such broad powers, this court held that the trustees are still required to act as prudent and provident persons would act under similar circumstances.[7]

In *Allis* the will granted the trustees:

" '. . . full power and authority in their discretion to invest, reinvest and employ said real estate and generally manage the same; to continue the same as it is invested at the time of my death—and especially as invested in the E. P. Allis Company, or to change such investments; to receive and collect such profits and income thereof, and to dispose of the net income as follows.' " [8]

In *Welch* the trust deed provided that:

" 'Said trustees, their survivors and successors, shall have full power and authority to grant, bargain, sell, convey and otherwise dispose of the whole or any part of said property and to invest and reinvest the proceeds of any sales thereof, and to convert personal property into real property and real property into personal property as they may deem for the best interests of the trust estate, . . .' " [9]

A comparison of the above-quoted provisions of the Mueller will (Article FIFTH (b)) discloses that the trustees (as to the article THIRD and FOURTH trusts) may well have been empowered to retain the Worthington stock without complying with statutory regulations in regard to the type or class of security retained. However, in the last analysis, and as the *Allis* and *Welch* cases held, regard-

---

[7] *Welch v. Welch, supra,* footnote 6, at page 314; *Estate of Allis, supra,* footnote 5, at page 33; see also Restatement, 1 Trusts (2d), p. 543, sec. 228, comment *q.*

[8] *In re Allis's Estate, supra,* footnote 4, at page 225.

[9] *Welch v. Welch, supra,* footnote 6, at page 294.

less of the trust provisions the ultimate question as to the two testamentary trusts and the *inter vivos* trust is whether or not the trustees acted prudently in retaining the Worthington stock.

Therefore, we now turn from a consideration of the effect of the terms of each trust instrument to an analysis of whether the action of the trustees in not diversifying each of the three trusts was prudent. The late Andrew Carnegie once admonished: "Put all your eggs in one basket and watch the basket." [10] This may be good advice for some investors, but it is not the prevailing rule governing the investment practices of trustees. [11] The rule is diversification. The exception is to retain the stock.

Is there any guide in the statutes as to what is prudent? Ch. 320, the trust-fund-investment chapter, was amended on August 1, 1959, to adopt the "prudent man" investment rule. [12] To begin with this statute provides:

"Executors, administrators, guardians and trustees may invest the funds of their trusts in accordance with the provisions pertaining to investments contained in the instrument under which they are acting, or in the absence of any such provision, then within the limits of the following standards:" [13]

Then follow subsections (1) and (2). Sec. 320.01 (1) provides that the fiduciary shall:

". . . exercise the judgment and care under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of their capital. . . ."

[10] *In re Kellogg's Trust* (1962), 35 Misc. (2d) 541, 230 N. Y. Supp. (2d), 836, 846.
[11] See Restatement, 1 Trusts (2d), p. 541, sec. 228; footnote 1, *supra*.
[12] Ch. 233, Laws of 1959.
[13] Sec. 320.01, Stats.

Sec. 320.01 (2) qualifies (1) by limiting (with certain qualifications not relevant here) the holdings in common stock to 50 percent of the total market value of the fund. Thus, in trusts subject to the provisions of sec. 320.01 (2), the statutes themselves forbid investment in common stock in excess of 50 percent of the fund. This is true of the *inter vivos* trust.

It appears that the standards set forth in sec. 320.01 (1) and (2), Stats., do not apply to the two testamentary trusts in the instant case in view of the authority vested in the trustee by the provisions above cited. On the other hand these standards do apply to the *inter vivos* trust where there was no similar provision in the trust instrument.

Respondents also point out that the statutes prior to August 1, 1959, limited investments in one stock to only 20 percent of the trust fund.[14] Since the trial court concluded that the Worthington stock in the trusts should have been sold in October or November, 1961, the provisions of this section were not in effect at the time and have no bearing on any legislative standard of what is prudent. This is true even though the trial court's determination that the trustees should have sold 80 percent of Worthington is apparently based, in part, on the provisions of this statute and, in part, on the fact that the objectors claim that the trustees had a duty to dispose of 80 percent of the stock.

Since the trial court concluded that the stock in all three trusts should have been diversified to the extent of 80 percent of the holdings of Worthington, the statutes, even as to the *inter vivos* trust, do not control what is prudent, and the determination as to whether or not the conduct of the appellant was prudent, in the last analysis, is governed as to all three trusts by the fundamental rules regarding diversification. The basic rule of diversification applies to both the

---

[14] Sec. 320.02 (4), Stats. 1953.

making of investments and the retention of investments. In the Restatement, 1 Trusts (2d), p. 548, sec. 230, comment *j,* it is stated, in part:

"*Diversification.* Except as otherwise provided by the terms of the trust, the trustee is under a duty to the beneficiary to distribute the risk of loss by disposing of investments included in the trust at the time of its creation which, although otherwise proper investments for the trustee to retain, are improper because not properly diversified. Compare § 228. Thus, if a testator bequeaths all his property in trust and more than half of his estate consists of the bonds of a particular railroad, the trustee is ordinarily under a duty to sell some of the bonds and to invest the proceeds in other securities, so that the estate will not include an undue proportion of the securities of a single corporation."

The trial court picked October 16, 1958, the date of the approval of the trustees' accounts in the article THIRD and FOURTH trusts, as the date when the trustees' duty arose to diversify by selling the Worthington stock in all three trusts. In essence, the court's conclusion is based entirely on the application of the fundamental rules requiring diversification of trust investments.

There is no point in considering whether the duty to diversify actually arose back in 1954 when the Worthington stock was first received. The objectors concede that the "Order of October 18, 1958, approving prior accounts had the effect of relieving the trustees from their *prior* duty to diversify." (Emphasis added.) It is the duty arising thereafter that the objectors contend for and which the trial court found. Once the duty to diversify arises the trustees should perform that duty as soon as they can reasonably do so.[15] Fixing the exact deadline for diversification is an extremely difficult task and the general rule guiding the court in making

[15] *Estate of Dreier* (1931), 204 Wis. 221, 235 N. W. 439.

that determination is set forth in 2 Scott, Trusts (2d ed.), p. 1548, sec. 209, where it is stated:

". . . it is ordinarily impossible to fix that moment [of the period within which he should have sold] with any exactness, at least where no time within which the trustee must sell the property is fixed in the trust instrument. Probably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time."

The trial court concluded that it was mandatory for the trustees to dispose of 80 percent of the stock no later than October or November of 1961. In arriving at this conclusion the trial court made certain findings of fact, which on review will be sustained unless against the great weight and clear preponderance of the evidence.[16]

As a director of Worthington, appellant was aware of antitrust actions within the electrical industry. The status of certain treble-damage suits against Worthington was discussed at a directors' meeting on October 18, 1961. Appellant attempts to minimize this knowledge by maintaining that he did not feel that Worthington would become involved in a significant number of suits. It may well be that Worthington's ultimate involvement in the suits was negligible. But the trial court's decision (Findings No. 10 and No. 11, and Conclusion No. 2) did not rest on this alone; it was not unreasonable for the trial court to have concluded that this information had at least a small bearing on the question of whether and when it was prudent to sell Worthington.

In addition, by virtue of his corporate office, appellant was aware that Worthington was in a profit squeeze. (Findings No. 10 and No. 11, and Conclusion No. 2). The percentage

---

[16] *Estate of Allis, supra,* footnote 5, at page 34; *Welch v. Welch, supra,* footnote 6, at page 307.

of income before taxes to billings had dropped from 7.18 percent in 1960 to 4.87 percent in 1961. Earnings dropped from $4.42 in 1960 to $3.40 in 1961. Dividends were also cut and the price of Worthington stock dropped approximately 50 percent between September, 1961, and December, 1962. Appellant counters that it was not only Worthington but the whole capital-goods industry that was involved in a profit squeeze. But this analysis ignores the possibility of investing in another segment of the market. Appellant also points out that the backlog of Worthington's unfilled orders was greater in 1961 than in 1960. But this is no particular advantage if profits are down.

Commencing on October 18, 1961, the date of the Worthington board of directors' meeting, the appellant resumed the sale of his personally held Worthington stock. (He had sold 20,500 shares from 1954 through 1958 with no sales after that date until those in 1961.) All told, in the months of October and November of 1961, he sold 13,000 shares so that by the end of these sales he had disposed of 53.2 percent of his total holdings of 62,850 shares, leaving 29,380 shares. He received an average price of approximately $51 per share on these 1961 sales. No trust shares of Worthington were sold until 1963.

Appellant maintains that the corpus of the trust would have been significantly reduced by the payment of the state and federal income taxes on any sales of Worthington (in 1961 or otherwise), and that the trial court ignored these tax consequences in arriving at its twofold conclusion: The duty to diversify and the mandatory sale date of 1961. The Mueller Furnace Company stock had a tax basis of zero in the THIRD and FOURTH article trusts, and five cents a share in the *inter vivos* trust. The respective bases were transferred to the Worthington stock under the tax-free reorganization in 1954. Although the tax factor is one which can be properly considered in passing on the prudence of the

trustee's actions,[17] the trial court not only made no mention of it in its conclusions, findings, or decision, but expressly indicated during the trial that "the tax angle has nothing to do with the propriety of the accounts." However, the failure of the trial court to consider any income-tax ramifications is not grounds, of itself, for reversal in this case. This is because the trial court could still have properly concluded, relying on the general rule calling for diversification in connection with appellant's knowledge of Worthington's financial condition, that it was imprudent to retain the stock even if he had considered the possible tax implications. This is not to say that the tax aspect is unimportant; rather it is to say that under the circumstances any tax advantages gained by not diversifying were outweighed by the factors requiring the sale of part of the Worthington stock.

At the trial, appellant introduced many investment digests, analyses, and bulletins he had received which indicated, in somewhat glowing terms, that Worthington was a sound investment. But a trustee cannot ignore the rule requiring diversification merely because a particular stock is a prudent investment in terms of quality.[18]

It is apparent from its decision and findings, that the trial court placed much emphasis on the fact that appellant Mueller disposed of a considerable block of his personal holdings of Worthington in the fall of 1961, while not making similar disposals of the stock in the trusts. However, although appellant did sell 13,000 shares in October and November, he retained 29,380 shares, or 46.8 percent of his original holdings in the company. No further sales were made until August of the next year. In addition, the mere fact that appellant sold some of his own Worthington stock does not mean that retaining the stock in the trusts was imprudent *per se*. The sale has a bearing on the present case

---

[17] See *In re Kellogg's Trust, supra,* footnote 10.
[18] Restatement, 1 Trusts (2d), p. 541, sec. 228, comment *a*.

only if the same reasons which prompted it would also dictate a diversification of the trusts. Because he was in a 90 percent tax bracket, appellant claims that he sold the Worthington stock, upon the suggestion of his financial adviser, in order to invest in municipals. Even assuming, then, that it was to his advantage to dispose of his Worthington holdings, this does not mean that it was not to the advantage of the beneficiaries to sell. Mrs. Mueller, the income beneficiary of the THIRD article and *inter vivos* trusts, was in the 65 percent bracket herself. Arguably, it would have been equally as sound to invest in municipals to give her a tax break also. But this is somewhat conjectural.

Appellant believes that a recent New York case, *In re Kellogg's Trust,*[19] controls the present situation. In *Kellogg,* the trust assets consisted of most of the stock of a holding company which in turn held stock of a family corporation and title to the family estate. A new tax law subsequently necessitated the dissolving of the holding company, and the assets passed directly to the trust. The beneficiaries objected to the trustee's account, claiming that it was improper to retain the stock of the family corporation as the sole asset. After considering all the relevant facts, the court found that the trustee had acted prudently. *Kellogg* can be distinguished on three grounds without discussing all the unique facts in the case. First, the court concluded that the stock could be retained under the terms of the trust agreement. This was not the case here. Second, New York law does not place the emphasis on diversification that Wisconsin law does. Third, in *Kellogg* the trustee had confidence that the long-range prospects of the business were good, whereas here the trustee had so little confidence in Worthington that he sold a sizeable block of his own stock.

The trial court found as a matter of fact (Finding No. 13) that appellant retained the Worthington stock in the trusts

[19] *Supra,* footnote 10.

primarily for voting-control purposes. But since there were over 1,600,000 shares of Worthington stock outstanding, of which only a little more than 15,000 were held by the trust, this could hardly have been a "paramount consideration." In addition, the fact that he had disposed of over half of his personal holdings is inconsistent with this purportedly avowed purpose. Furthermore, there was no evidence adduced which affirmatively demonstrated that voting control played any part in his decision. Therefore, this particular finding is against the great weight and clear preponderance of the evidence.

However, keeping in mind that diversification is the general rule, it cannot be said, in light of the information possessed by appellant concerning the financial affairs of Worthington, that the trial court erred in concluding that 80 percent of the stock should have been sold in the fall of 1961.

### Estoppel.

The trial court concluded (Conclusion No. 3) that, "None of the beneficiaries of the trusts are estopped" from making a claim against appellant Mueller. Appellant attacks this as error.

As previously discussed, the beneficiaries of the two testamentary trusts concede that they are barred in these proceedings from questioning the prudence of retaining the Worthington stock as the sole asset prior to October 16, 1958, the date the accounts were approved. However, they do not concede that they are barred from questioning the prudence of retaining the stock in those two trusts after that date.

The general rule is that a beneficiary who, with knowledge of the facts, has acquiesced in the carrying of certain securities by the trustee is precluded from obtaining relief for a

breach of trust for holding them.[20] The key fact of which the beneficiary must have knowledge is that the specific asset, the retention of which he now complains was imprudent, was held by the trust.

With reference to the *inter vivos* trust, there is no evidence that any of the beneficiaries were aware that the Worthington stock was the sole asset in the trust. It was reasonable, therefore, for the trial court to conclude that none of the beneficiaries of that trust is estopped from objecting to the appellant's failure to diversify.

With reference to the article THIRD and FOURTH trusts, none of the beneficiaries, with the exception of Jean Mueller, knew of the status of the trust assets. Whether Jean Mueller is estopped because of her knowledge that Worthington continued as the sole asset of these trusts gained from her signing of the annual accounts, presents a moot question because in any event the other beneficiaries were not estopped from objecting to the failure to diversify these trusts.

### *Liability of Cotrustee.*

After concluding (Conclusion No. 4) that appellant and respondent Jean Mueller were each at fault in the THIRD and FOURTH article trusts and thus equally responsible to the other beneficiaries, the trial court decided that Mrs. Mueller was entitled to indemnity from appellant for any liability on her part but that appellant had no corresponding right of indemnity against her because he was "substantially more at fault."

While she does not specifically attack the conclusion that she was at fault, respondent Jean Mueller devotes much time in her discussion of the indemnity issue to the proposition

[20] *Will of North* (1940), 235 Wis. 639, 294 N. W. 15; *Estate of Schlicht* (1939), 231 Wis. 324, 285 N. W. 730; *Estate of Grotenrath* (1935), 217 Wis. 109, 258 N. W. 453.

that she was in no way culpable. Since the question of indemnity does not even arise unless she actually was at fault, her argument along those lines will be treated, for the purposes of this opinion, as a challenge to the trial court's decision.

According to the Restatement, a cotrustee is liable to beneficiaries for a breach of trust committed by another cotrustee if he:

"  . . .
"(b) improperly delegates the administration of the trust to his co-trustee; or
"  . . .
"(d) by his failure to exercise reasonable care in the administration of the trust has enabled his co-trustee to commit a breach of trust; . . ." [21]

These clauses are illustrated as follows:

"[b] A and B are co-trustees. A directs B to invest the trust funds without consulting with A. In breach of trust B invests in shares of stock. A is liable for breach of trust."

"[d] A and B are co-trustees. A improperly permits B to have the sole custody and management of the trust property and makes no inquiry as to his conduct. B is thereby enabled to sell the trust property and embezzle the proceeds. A is liable for breach of trust."

It should be noted that the breaches in the examples involved affirmative conduct on the part of one of the trustees. In the clause (b) example, one trustee actually directed the other to manage the trust, while in the clause (d) illustration the trustee was guilty of embezzlement. In the present case, there is no evidence that respondent Jean Mueller expressly authorized appellant to handle the trust affairs. It appears that any fault on the part of appellant was passive rather than

---

[21] Restatement, 1 Trusts (2d), p. 521, sec. 224 (2). .

active. But there is no good reason why subsection (b) should not apply when the one trustee impliedly consents to letting the other do the administering, or why (d) would not apply in a situation where the breach results from mere omission.

Professor Scott says:

"Where there are several trustees, each of them is under a duty to participate in the administration of the trust and to use reasonable care to prevent a co-trustee from committing a breach of trust. Even if one trustee does not affirmatively delegate the administration of the trust to his co-trustee, he is liable if by his failure to exercise reasonable care in supervising the conduct of his co-trustee he allows him to commit a breach of trust." [22]

Respondent Jean Mueller was content to let appellant alone handle the trust affairs from the date of its inception. The record shows that she made no inquiries of him regarding trust affairs subsequent to the time the Worthington stock was acquired in 1954. Having assumed the position of trustee, she was bound to perform the duties required of her, and cannot escape liability merely because she relied entirely on the cotrustee to actually run the show. Any other result would drive cotrustees into the weeds for safety's sake.

Having established that respondent Jean Mueller was at fault, the question of whether appellant is entitled to indemnity or contribution from her is reached.

The general rule is that when two trustees are liable for a breach of trust, each is entitled to contribution from the other except that:

"(a) if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him; . . ." [23]

---

[22] 2 Scott, Trusts (2d ed.), p. 1640, sec. 224.3.
[23] Restatement, 1 Trusts (2d), p. 650, sec. 258 (1) (a).

The Restatement lists four factors to be considered in determining whether one trustee is substantially more at fault than the other:

"(1) whether he fraudulently induced the other to join in the breach of trust; (2) whether he intentionally committed a breach of trust and the other was at most guilty of negligence; (3) whether because of his greater experience he controlled the conduct of the other, as in the case where he was an attorney and the other was a person without business experience who was accustomed to rely upon his judgment; (4) whether he alone committed the breach of trust and the other is liable only because of an improper delegation, or failure to exercise reasonable care to prevent him from committing a breach of trust, or neglect to take proper steps to compel him to redress the breach of trust." [24]

Respondent Jean Mueller considers the following example given in the Restatement to control the present case:

"A and B are trustees for C. B permits A to assume the sole management of the trust. A purchases securities which are not proper trust investments. B does not know of or consent to the purchase. The securities are sold at a loss of $1000. If A makes good the loss he is not entitled to recover anything from B. If B makes good the loss he is entitled to recover $1000 from A." [25]

But since her consent was required before any trust assets could be sold, Jean Mueller knew that the Worthington stock was the sole asset of the trust, and knew that no sales of Worthington were being made to diversify the trust. As a trustee she was bound, as much as appellant, to diversify the trust assets unless it was imprudent to do so.

One trustee is not more at fault so as not to be entitled to contribution merely because he was more negligent or active than the other. The mere fact that the other trustee did not

---

[24] Restatement, 1 Trusts (2d), p. 652, sec. 258, comment *d*.
[25] Id. Illustration 4.

actively participate in the breach does not necessarily put him in the position of being substantially less at fault.[26]

We conclude, therefore, that Harold Mueller was not "substantially more at fault" than Jean Mueller. It follows that, although each is surcharged for the entire amount of the charge as to the two testamentary trusts where they were cotrustees, if the appellant pays the entire amount he is entitled to a contribution from Jean Mueller of half that amount. If she pays the entire amount then she is entitled to contribution from appellant of half the amount. In other words, they should share equally in these particular surcharges.

A minority of the court, including the author of this opinion, would affirm the lower court and hold that the appellant was "substantially more at fault" because of the fact that for whatever motive he sold a substantial block of his own Worthington stock in October or November of 1961 (after not making any personal sales of Worthington since 1958) without discussing with his cotrustee the fact of these sales or the advisability of selling or retaining the trust holdings in Worthington.

*By the Court.*—Judgment reversed as to that part ordering Harold P. Mueller to indemnify Jean Mueller with respect to the surcharges and interest thereon imposed under the testamentary trusts pursuant to paragraph 1 of the judgment; paragraphs 1 and 3 of the judgment affirmed; paragraph 4 vacated and cause remanded for revision thereof in a manner not inconsistent with this opinion. Costs on this appeal to be awarded to appellant as against respondent Jean Mueller and to other respondents as against appellant.

---

[26] Restatement, 1 Trusts (2d), p. 653, sec. 258, comment *e.*