In Matter of Trust of Sensenbrenner, Deceased: Sensenbrenner, Objector-Appellant, v. Sensenbrenner, and others, Trustees-Respondents.

*No. 75–382. Argued February 28, 1977.—Decided March 29, 1977.*
(Also reported in 252 N. W. 2d 47.)

628

For the appellant there were briefs by *Harrold J. McComas, Keith A. Christiansen* and *Foley & Lardner,* and oral argument by *Mr. McComas,* all of Milwaukee.

For the respondents there was a brief by *Remley, Sensenbrenner, Stein & Cummings, S. C.,* and oral argument by *F. Joseph Sensenbrenner,* all of Milwaukee.

CONNOR T. HANSEN, J. Frank J. Sensenbrenner died in 1952. His last will and testament created four equal trusts for the benefit of his four children: John S. Sensenbrenner, J. Leslie Sensenbrenner, Margaret Sensenbrenner Gilbert, and Gertrude Sensenbrenner Bergstrom. The trusts created separate limited life estates for each child with the remainder interest passing to either the child's descendants or to one of the other trusts created by the will. John S. Sensenbrenner, J. Leslie Sensenbrenner and William H. Clifford were designated as the trustees of all four trusts. John S. Sensenbrenner and J. Leslie Sensenbrenner thus held the positions of both trustee and beneficiary under their respective trusts.

Gertrude Sensenbrenner Bergstrom died in 1973. Pursuant to the last will and testament of the senior Sensenbrenner, on June 25, 1973, the assets of her

trust were assigned in equal shares to the trusts created for the then three surviving children of the original settlor.

John S. Sensenbrenner died October 8, 1973, and this litigation arises out of the settlement of his trust. The will of the settlor provided that the trust terminate at the death of John S. Sensenbrenner, and, insofar as this case is concerned, that the assets be distributed among his then living children in equal shares. He was survived by four children, one of whom was F. James Sensenbrenner, Sr., the appellant in this case.

On October 8, 1973, the trust fund corpus had a market value of $2,545,545.16; comprised of stocks valued at $2,072,300.88; bonds valued at $446,646.20; and $26,598.08 cash. These assets were distributed to the remaindermen in kind. The actual transfer of the common stock occurred on April 30, 1974, and of the bonds on June 14, 1974. During the time between the death of John S. Sensenbrenner on October 8, 1973, and the actual transfer of the securities to the remaindermen, the common stock declined in value by $568,035.79, and the bonds by $26,846.61. The appellant asserts that the total loss of trust assets during this period was $595,000 and that his one-quarter interest in the trust was thus diminished by $148,750.

The appellant filed an "OBJECTION TO FINAL ACCOUNT AND DISCHARGE OF TRUSTEES." Appellant alleged that the loss in value of trust assets was occasioned by ". . . reason of the failure, refusal and neglect of the Trustees of said Trust promptly to allocate, pay and distribute said trust assets to the remaindermen beneficiaries. . . ." He also objected to the allowance of a trust termination fee and to the discharge of the trustees until such time as they ". . . repay, reimburse, satisfy and indemnify . . ." the appellant for his alleged loss.

Judgment was entered approving and allowing the account of the trustees and trustees' termination fees. This appeal follows. Three issues are presented:

1. Under the circumstances, was the time taken by the trustees to distribute the trust assets unreasonable, so as to subject the trustees to surcharge for the depreciation in value of those assets which occurred between termination of the trust and distribution?

2. Was the termination fee allowed to the trustees fair and reasonable?

3. Were any issues regarding the Gertrude Sensenbrenner Bergstrom Trust before the trial court?

## REASONABLENESS OF TIME FOR DISTRIBUTION.

The initial three trustees administered the trust assets at all times until the death of John S. Sensenbrenner. Immediately upon his death attention was given to the termination of his trust. The First National Bank of Neenah (hereinafter custodian) had long been custodian of the securities and for ease of transfer the securities were registered in the name of one of its nominees. Shortly after the death of John S. Sensenbrenner, the two remaining trustees,[1] caused to be prepared a valuation of the trust account as of the date of death and a distribution schedule making equal allocations to the four remaindermen.

The valuation process took the balance of the month of October. During the process, the trustees concluded that a possible tax throwback problem existed and they decided to secure a legal opinion from a law firm in Chicago. The opinion was requested by the custodian bank in November, 1973, and was received in April,

[1] J. Russell Ward was appointed successor trustee for John S. Sensenbrenner, effective February 1, 1974.

1974. The final accounting was completed and submitted to the trustees on a computer print-out form.

Sometime subsequent to the submission of the valuation, the trustees or the custodian bank penciled out a proposed distribution schedule. A meeting to implement or discuss the distribution was held in late November or early December, 1973. Present were: F. Joseph Sensenbrenner, then attorney for the trustees (later to become a trustee); William H. Clifford and J. Leslie Sensenbrenner, the two surviving trustees; and representatives of the custodian bank, including James H. Lewis, vice president and trust officer of the custodian bank. As a result of that meeting, the penciled-out distribution schedules were agreed to. On or after November 8, 1973, several odd-lot sales of stocks and bonds, noted in the distribution schedule, were made.

Whether the agreement constituted a directive to the custodian bank to implement the transfers of the other securities to effectuate the distribution is a subject of controversy. At the subsequent hearing in this case, J. Leslie Sensenbrenner testified that it was his understanding that the transfer and distribution of the securities were to proceed directly as a result of the meeting, with the custodian bank handling the mechanics necessary to accomplish the distribution. Lewis was of the opinion that the agreement of the beneficiaries was needed before the actual transfer took place. The specific instructions to accomplish the required transfers were not forthcoming until late February or early March, 1974. The custodian bank sent the stocks in for transfer in late February or early March, 1974. The bonds were sent in for transfer around the middle of April, 1974. The stocks were actually distributed to the remaindermen on April 30, 1974; the bonds were distributed on June 14, 1974.

The record reflects that trustee Clifford entered the hospital in mid-December, 1973, suffering from cancer.

During January and February, 1974, he sought treatment for his illness in Texas and died of a heart attack on February 5, 1974.[2] J. Leslie Sensenbrenner, the other surviving initial trustee was eighty years of age. He was present when the preliminary distribution schedule was developed in November of 1973, but apparently left shortly thereafter to spend the winter in Florida.

At the hearing on the final account, Lewis, trust officer of the custodian bank, testified that actual transfer of the securities would take six to eight weeks. Harold J. Luedeman, expert witness for the appellant, testified that the normal amount of time for such transfers was two to three weeks. Subsequent events showed that Lewis was correct. The trust consisted of 37 stock issues and 21 bond issues.

On the foregoing facts and the provisions of the will of Frank J. Sensenbrenner the trial court made its decision and entered the following conclusions of law:

"1. That the Trustees of the John S. Sensenbrenner Trust did not, after the death of life tenant, John S. Sensenbrenner, unreasonably delay the distribution of the Trust's assets to the remaindermen-beneficiaries entitled thereto;

"2. That the Trustees of the John S. Sensenbrenner Trust are not liable for any loss of the market value of said Trust's assets from the time of the death of life tenant, John S. Sensenbrenner, until the times of the distributions thereof to the remaindermen-beneficiaries;

"3. That the Trustees of the John S. Sensenbrenner Trust are entitled to a reasonable fee for their services in terminating said Trust."

Judgment was entered terminating the John S. Sensenbrenner Trust; allowing all accounts and trustees' fees in the amount of $5,795.55, which the trial court found to be fair and reasonable; and assigning assets of the trust. The trial court viewed all of the facts and circum-

[2] F. Joseph Sensenbrenner was appointed successor trustee for Clifford, effective March 15, 1974.

stances and determined that the trustees did not unreasonably delay in the distribution of the trust assets to the remaindermen. That finding and the findings of fact upon which it was based, will not be disturbed on this appeal unless contrary to the great weight and clear preponderance of the evidence or unless based upon an error of law. *Estate of Scheibe,* 35 Wis.2d 89, 94, 150 N.W.2d 427 (1967); *Will of Mueller,* 28 Wis.2d 26, 40, 135 N.W.2d 854 (1965); *Estate of Gehl,* 5 Wis.2d 91, 96, 92 N.W.2d 372 (1958); *Welch v. Welch,* 235 Wis. 282, 307, 290 N.W. 758, 293 N.W. 150 (1940); *Estate of Allis,* 191 Wis. 23, 33, 34, 209 N.W. 945; 210 N.W. 418 (1926).

We believe the law is clear that upon the event terminating a trust, the trustees must use due care and diligence to distribute the trust assets. The distribution must be accomplished as soon as it is reasonably possible to do so. The Restatement, 2 *Trusts* (2d), pp. 193, 195, sec. 345, provides:

"When the time for the termination of the trust has arrived it is the duty of the trustee to proceed with expedition to wind up the trust and distribute the estate. The trustee is entitled to take such time and such steps as are reasonably necessary for the protection of the interests of the beneficiary and for the trustee's own protection.

"The trustee is not under a duty to make a distribution of the whole estate until he has had an opportunity to make an accounting and to obtain a decree of the court approving the distribution. It is the duty of the trustee, however, to make his final accounting with reasonable promptness."

*See also:* IV *Scott on Trusts* (3d ed.), p. 2741, sec. 345.1, and 10 Bogert, *Trusts & Trustees* (2d ed.), p. 574, sec. 1010.

The duty to proceed with expedition in winding up the affairs of the trust estate upon termination necessarily flows from the high standards of management of a trust estate to which trustees have long been held in this state. That standard was expressed in *Estate of Allis, supra,* 29:

". . . A trustee occupies a position of peculiar responsibility. A trustee is selected because of confidence in his diligence, prudence, and absolute fidelity, as well as in his ability to so administer the trust as to protect those who, through infancy or other cause, are not able to protect their own interests. The performance of the duties of a trustee requires the exercise of a high degree of fidelity, vigilance, and ability. . . .

"Wisconsin early adopted the rule that trustees must exercise more than ordinary diligence and vigilance in the management of a trust estate . . . Good faith alone in making an investment will not protect a trustee. . . A trustee must also exercise diligence, prudence, and absolute fidelity."

That standard has been repeatedly applied by this court, generally expressed in terms of the requirement that a trustee act as a prudent and provident person would act under the circumstances. *Estate of Poulsen,* 54 Wis.2d 139, 143, 194 N.W.2d 593 (1972); *Estate of Scheibe,* 30 Wis.2d 116, 119, 140 N.W.2d 196 (1966); *Will of Mueller, supra,* 36; *Estate of Martin,* 21 Wis.2d 334, 341, 124 N.W.2d 297 (1963); *Welch v. Welch, supra,* 314.

The same standards to which the trustee is held in the ongoing management of the trust estate must, therefore, apply to the distribution of the trust assets phase of the management of the trust estate. This court has recognized that the standard of due care and diligence to which a trustee is held includes the requirement that the trustee perform his designated duties within a rea-

sonable time after they arise. *Will of Mueller, supra,* 39; *Will of North,* 235 Wis. 639, 643, 294 N.W. 15 (1940); *Estate of George,* 225 Wis. 251, 256, 257, 270 N.W. 538 (1937); *Will of Church,* 221 Wis. 472, 481, 266 N.W. 210 (1936); *Estate of Dreier,* 204 Wis. 221, 227, 235 N.W. 439 (1931).

The sanction for not performing the required duty within a reasonable amount of time is a surcharge for any loss thereby caused to the trust assets. The above cited cases are all illustrative. The same sanction applies to losses caused by or incurred during an unreasonable delay in distributing trust assets. In *Scott on Trusts, supra,* 2741, 2742, sec. 345.1, it is stated:

"Where the trustee is not guilty of undue delay in making distribution, he is not liable to a surcharge for a depreciation of the trust property not due to any fault of his. He is not liable in such a case for interest on the trust funds, except such interest as he receives or should have received. On the other hand, if the trustee unduly delays in the winding up of the trust, he is liable for a depreciation in value of the trust property. In the case of such a delay the beneficiary can also hold him liable for interest."

*See also:* Restatement, 2 *Trusts, supra,* p. 196, sec. 345, *Comment f.;* Bogert, *Trusts & Trustees, supra,* p. 580, sec. 1010.

If a trustee is to be subject to surcharge, the depreciation must have occurred after a reasonable amount of time for distribution has passed. The general rule guiding the trial court in the determination of what constitutes an unreasonable delay is set forth in *Scott on Trusts, supra,* p. 2741, sec. 345.1:

"§ *345.1 Delay in making conveyance.* When the time for the termination of the trust has arrived, it is the

duty of the trustee to wind up the trust and make distribution of the trust property as soon as he reasonably can do so. Whether the trustee has been guilty of an improper delay in winding up the trust depends upon all the circumstances. Where the estate is large and where property must be sold prior to disposition, particularly where the property is not readily salable, where it is difficult to ascertain the proper distributees, or where the estate is involved in litigation, the trustee can properly take more time before the trust is wound up than where the circumstances make the winding up of the trust a simple process. The trustee, before he makes the final distribution of the whole of the trust property, is entitled to have the court pass upon his accounts and make a decree of distribution for his protection."

*See also:* Restatement, 2 *Trusts, supra,* p. 195, sec. 345; *Will of Mueller, supra,* 39–45.

The trial court's finding that there was no unreasonable delay in the distribution of the trust assets, as reflected in its memorandum decision and judgment was based upon three areas of consideration: (1) The nature of the trust and trust estate; (2) the character and qualities of and events affecting the trustees; and (3) the legal problems encountered during termination in regard to income tax.

The trial court characterized the trust as a " 'Family Affair,' " wherein the settlor chose his two sons and a business associate as trustees rather than a corporate institution specializing in trust administration. The appellant contends that all trustees, regardless of background, are required to perform the same fiduciary obligations with the same degree of fidelity and skill, whether corporate or individual. This court has in the past recognized a distinction between individual and corporate trustees in the degree of ability to be expected in the administration of a trust estate. *Guardianship of Bose,* 39 Wis.2d 80, 88, 158 N.W.2d 337 (1968) ; *Estate*

*of Scheibe, supra,* 120 (1966) ; *Estate of Allis, supra,* 29. The distinction does not mean that the due care and diligence required of the individual trustee is lessened, but rather that the standards required may not be as high as those required of a corporate trustee which holds itself out as possessing a special skill in the performance of the duties of a trustee. The finding of the trial court in this regard (*i.e.,* that the trust constituted a " 'Family Affair' ") is supported by the evidence of record and the consideration of the above factor was proper, although not necessarily a controlling factor in the ultimate conclusion.

The trial court found that William H. Clifford was the " 'mainstay' " of the trust; that ". . . [i]t may well be that the Trustor intended and expected the heavier burden to fall upon [him]"; that Clifford was sick on October 8, 1973, and died on February 5, 1974; and that between those two dates, Clifford carried out his duties as trustee but not with the vigor and ability of a younger man in good health. The appellant disputes all of those findings of fact except the fact that Clifford died on February 5, 1974.

The record amply supports the finding that Clifford was the " 'mainstay' " of the trust. The trust instrument itself granted greater powers to the non-beneficiary trustee than to the beneficiary trustees. Clifford was the only non-beneficiary trustee. In addition, the settlor provided for the replacement of Clifford in a manner different from that to be used for the replacement of other trustees. There was a clear indication that the settlor was concerned with possible conflicts of interest of the beneficiary trustees in the management of the trust assets and thus provided that a non-beneficiary trustee was to exercise more power in those instances where conflict might arise.

Furthermore, it appears from the testimony that neither of the other trustees ever received or were to

receive any fees for administering the trust. Since all trustee fees were to be paid to Clifford, it is reasonable to infer that he was to perform and did perform the majority of the work involved in administering the trust. The fact that the other surviving trustee, J. Leslie Sensenbrenner, left for Florida during the termination proceedings is a further indication that Clifford was to perform the tasks incident to distribution.

As the appellant contends, there may well be joint and several responsibility among trustees for the management of a trust. *See: Guardianship of Bose, supra,* 87; *Will of Mueller, supra,* 47. However, no doctrine prohibits one trustee from performing the majority of the duties involved and shouldering the heavier burden of the trust management. *Welch, supra.* While the responsibility and liability for breach of the trust relationship may not be shifted between trustees (absent a controlling provision in the trust instrument) the delegation of actual duties between them is a matter of their own concern. *Guardianship of Bose, supra,* 87; *Abrams v. United States Fidelity & Guaranty Co.,* 127 Wis. 579, 584, 106 N.W. 1091 (1906). The evidence fully supports the finding of fact that Clifford was the " 'mainstay' " of the trust.

The trial court found that Clifford was ill on October 8, 1973, and that he performed his duties with less vigor and ability than ordinary between that date and mid-December, when he entered the hospital. While this finding may be against the great weight and clear preponderance of the evidence, it is not of such a nature as to affect the outcome of the case. We are also of the opinion that it was proper for the trial court to give consideration to the fact that trustee, J. Leslie Sensenbrenner, was eighty years of age and spending the winter in Florida.

The trial court also found that the trustees believed that it was necessary to appoint a successor trustee to replace the deceased John S. Sensenbrenner. The trial court did not hold that it *was* necessary to appoint a third trustee, as the appellant contends, but that the surviving trustees believed so. The testimony of J. Leslie Sensenbrenner amply supports the finding that at least one of the trustees believed so. The finding, however, appears to be in no way critical to the trial court's ultimate holding. Even if one of the surviving trustees did believe that a third trustee must be appointed prior to distributing the assets, the record is clear that the two surviving trustees proceeded expeditiously with the preliminary steps toward distribution including the odd-lot sales, and most likely would have accomplished distribution without the appointment of a third trustee, were it not for other intervening factors.

The trial court found that the trustees had encountered a tax problem for which they sought legal advice. The appellant does not dispute the fact that a tax problem did arise prior to the distribution, but does dispute any conclusion that the tax problem was a reasonable cause for delay in distribution.

Lewis testified that during the valuation process in November, 1973, a possible income tax throwback problem arose. He was directed to secure a legal opinion concerning the problem from counsel in Chicago. The opinion was requested in November, 1973, and was finally received in April, 1974, after the distribution process had actually begun. Lewis testified that the tax problem was "[q]uite similar," but ". . . not the same" as one which had arisen during the termination of the Gertrude Sensenbrenner Bergstrom Trust. A legal opinion had likewise been requested and received concerning that trust. The appellant apparently contends that no delay

was justified because the trustees already had the answer to their problem at hand. The contention overlooks the fact that in tax matters, "[q]uite similar" does not mean the exact same. Two different trusts were involved with different terminating provisions and different beneficiaries. There was no evidence that the trusts were exactly alike and that tax impacts on one would be the same for the other. Tax matters are proper consideration in the distribution phase of trust termination. *See: Will of Mueller, supra,* 41, 42, *citing In re Kellogg's Trust,* 35 Misc.2d 541, 230 N.Y.S.2d 836 (1962).

The totality of several factors, as found by the trial court, and as appear in the record, amply explain and justify the delay. These included: The solicitation of legal advice concerning a legitimately perceived income tax throwback problem; the appointment of a third trustee to replace John S. Sensenbrenner; the sickness, hospitalization and death of Clifford at a critical time during the termination proceedings; the appointment of his successor trustee; the physical absence of the surviving co-trustee; the indication that the trustees desired to obtain the approval of the remaindermen before accomplishing the actual distribution; and the solicitation and receipt of the waivers and consents from the remaindermen.

While each factor standing alone might not justify the delay in the distribution, the facts indicate that there was a continuous flow of trustee activity with regard to the termination of the trust following the death of John S. Sensenbrenner. Under all the facts and circumstances, the trial court found that it was not unreasonable delay. It cannot be said as a matter of law that the delay was unreasonable, nor is the trial court's ultimate finding against the great weight and clear preponderance of the evidence. This is not a case where no reason for the delay appears on the record,

as the appellant contends. The facts and circumstances both explain and justify the delay. *See: Will of Blomdahl,* 216 Wis. 590, 257 N.W. 152; 258 N.W. 168 (1935).

As each determination of a reasonable amount of time for distribution must stand on its own facts, the comparison of the distribution period in the Gertrude Sensenbrenner Bergstrom Trust is of no avail to the appellant. It does not appear that the termination of that trust involved the death of one of the trustees as the termination event; nor the death of the non-relative trustee during the critical period of the distribution process. Moreover, it appears that in that termination proceeding, the legal opinion involving the income tax throwback problem there involved was acquired in a shorter time.

[14]

In the case before us, the trial court filed an extensive memorandum decision. It set forth a resume of the facts and the law and concluded that an unreasonable period of time had not elapsed in making the distribution of the trust assets. As we have stated, the trial court did not err as a matter of law in arriving at this conclusion, and it is not against the great weight and clear preponderance of the evidence. Having reached this conclusion, the trial court then directed its attention to the following legal principles: (1) The application of the "prudent man rule" insofar as investments were concerned; (2) the determination that sec. 701.22, Stats., *Distributions in kind by trustees; marital bequests.,* was applicable; (3) the application of the general rule that trustees need not be omniscient with regard to investment decisions; and (4) the consideration of the applicability of sec. 701.16 (5), *Testamentary trustees; final accounting,* and sec. 881.05 (2), *Retention of securities by trustee.*

The appellant contends that these four legal principles are inapplicable and that the trial court confusedly and

improperly intertwined them in its determination of whether the trustees acted with due diligence and reasonable speed in distributing trust assets upon termination of the trust. We do not consider this argument because we are of the opinion that consideration of these principles by the trial court was undertaken after and was irrelevant to its determination that the trustees did not unreasonably delay the distribution of the trust assets.

## TRUSTEES' FEES.

The trial court found that the sum of $5,795.55 was a fair and reasonable closing fee to be paid to the trustees on termination of the trust. The trustees originally requested a termination fee of $25,545.55, based on one percent of the fair market value of the trust assets on October 8, 1973. The only evidence concerning a termination fee was elicited from witness Lewis who testified as to what the custodian bank's own fee schedule as a corporate trustee would have been under similar circumstances. The trial court accepted and relied on that evidence in awarding the fee.

The appellant contends that the trustees, because of their lack of due diligence in distributing the assets, were entitled to no fee. If the trustees had breached their fiduciary duty in distributing the assets of the trust, this court could properly deny all compensation. *Estate of Deibig,* 49 Wis.2d 237, 245, 181 N.W.2d 413 (1970); *Estate of Martin,* 39 Wis.2d 437, 444, 159 N.W.2d 660 (1968); *Joerres v. Koscielniak,* 13 Wis.2d 242, 248, 108 N.W.2d 569 (1961). Since the trial court found, however, that the time period taken for distribution was reasonable, and thus that the trustees had exercised due diligence, and since that finding is not contrary to the

great weight and clear preponderance of the evidence, a complete denial of termination fees is not in order.

The question remains as to whether the fee awarded was reasonable? The usual criteria for determining the amount of trustees' fees was set forth by this court in *Estate of Peabody*, 218 Wis. 541, 260 N.W. 444 (1935). Therein this court said at pages 545 and 546:

"The character and powers of a trusteeship, the relation of such position to all duties imposed and the accompanying responsibilities must be recognized as the premise from which appellants' obligations to the trust arise and upon which the right to compensation and the extent thereof must be justified. . . The trial court seems to have been controlled or strongly moved to his decision by the custom of trust companies, when acting as trustees, of charging for their services at the rate of five per cent of the income from the estate. That method or measure of arriving at a compensation is often used. The statutes in some states provide for it. But even in those states, extraordinary services performed by a trustee may warrant additional compensation. The reckoning by a percentage basis is only used for its convenience; the question is not one of percentage, but of compensation for 'responsibility incurred and labor expended.' . . ."

and further at page 549:

". . . As has been said, in approaching this question [of compensation] consideration must be given to the whole field of operation in which the trustees acted including the elements of risk assumed, responsibility, service, and time and labor actually spent in the performance of duties arising out of the acceptance of the trust. . . ."

*See also: Estate of Teasdale*, 261 Wis. 248, 52 N.W.2d 366 (1952).

The foregoing criteria can be properly considered in arriving at a termination fee.

The appellant argues that the trustees did not themselves handle the income tax throwback question; did not

prepare the valuation of the trust assets; and did not handle the sale or re-registration of securities to effect the distribution. The record reflects, however, that the trustees did prepare the tentative distribution schedule. Moreover, the trustees caused all of the above to be accomplished, assumed the responsibility for their accomplishment and the risk of liability if they were not accomplished. The trust was in fact terminated and the assets were distributed. No lack of performance on the part of the trustees in terminating the trust was established. The trustees were clearly entitled to a reasonable termination fee.

The trial court relied on the testimony of Lewis in arriving at a reasonable termination fee for the trustees. His testimony set forth the customary fee of the bank. That was the only evidence presented to the trial court. No evidence was presented by the appellant as to how much the customary corporate fee should be reduced, if at all, in the case of individual trustees, or what factors could cause a reduction. In the absence of a finding that the trustees failed to perform their fiduciary duty and in the absence of any other evidence as to reasonableness, the trial court was entitled to consider the testimony of Lewis in determining the fee.

Considering the value of the trust estate and the problems encountered in its termination, the amount allowed by the trial court to the trustees for termination fees is not unreasonable or excessive. The matter of compensation to a trustee for services lies within the sound discretion of the trial court in view of the particular facts and circumstances in each case. *Estate of Martin, supra* (1968), 444; *Joerres, supra,* 248; *Estate of Teasdale, supra,* 264. That discretion was not abused in this case.

## *GERTRUDE SENSENBRENNER BERGSTROM TRUST.*

The appellant contends that the trustees should be surcharged for their consent to an unreasonable trustee termination fee in the termination of the Gertrude Sensenbrenner Bergstrom Trust. That trust was terminated on June 25, 1973, as a result of her death. The assets of her trust were distributed in equal shares to the trusts of John S. Sensenbrenner, J. Leslie Sensenbrenner and Margaret Sensenbrenner Gilbert. The trustees at the time of her death and the distribution of her trust were John S. Sensenbrenner, J. Leslie Sensenbrenner and William H. Clifford. They requested and were allowed a trust termination fee of $17,137.01, which was based upon the valuation of the trust assets.

The appellant contends that the proceedings at which the $17,137.01 trust termination fee was allowed were held upon waiver of notice executed by the trustees of the Gertrude Sensenbrenner Bergstrom Trust, who, at that time, were also the trustees for the three remaining trusts. No notice of the proceedings was given, however, to the remaindermen beneficiaries of the three trusts which received distributed assets. The appellant asserts that the failure to give him notice entitles him to raise the issue of the reasonableness of the termination fee in a challenge to the final accounting in the John S. Sensenbrenner Trust. The question is not whether he was entitled to raise the issue, but whether he did raise the issue at the hearing. Our examination of the records leads us to conclude that the issue was not raised.

The trial court in its memorandum decision stated:

"All briefs filed contain 'statements of fact' not brought into evidence. Objector's brief has discourse concerning alleged improprieties in the handling of the Gertrude Sensenbrenner Trust, which matter was not before the Court."

A review of the record indicates that there was no issue relative to the Gertrude Sensenbrenner Bergstrom Trust termination fees before the trial court at the hearing on the petition for termination of the John S. Sensenbrenner Trust. The formal objection of the appellant served on the trustees and filed with the trial court stated no objection to the termination of the Gertrude Sensenbrenner Bergstrom Trust. At the commencement of the hearing counsel for· the appellant specifically advised the trial court that the matters before it were the objection to the proposed termination fee in the John S. Sensenbrenner Trust and an objection ". . . with respect to the loss of market value in the seven months' delay in the distribution of the assets . . ." During the hearing no testimony or evidence was received in reference to the termination fees allowed in the Gertrude Sensenbrenner Bergstrom Trust.

The first time the issue was raised was in the appellant's brief filed with the trial court after the hearing. The trial court, in view of the facts that the issue had not been previously raised and argued, and that no evidence concerning the issue was introduced, properly declined to consider the issue. *Howard v. State Farm Mut. Auto L. Ins. Co.*, 70 Wis.2d 985, 994, 236 N.W.2d 643 (1975); *Hasley v. Black, Sivalls & Bryson, Inc.*, 70 Wis.2d 562, 569, 570, 235 N.W.2d 446 (1975); *Pipkorn v. Brown Deer*, 9 Wis.2d 571, 580, 101 N.W.2d 623 (1960).

The judgment of the trial court is affirmed.

*By the Court.*—Judgment affirmed.