## Richmond

### Philip Reid Hirsh, III, Et Al., Etc. v. Allan Mortimer Hirsh, Jr., Trustee, Etc., Et Al.

March 10, 1969.

Record No. 6830.

Present, All the Justices.

*Erwin S. Solomon* for appellants.

*R. Colston Christian* (*Williams, Mullen & Christian*, on brief), for appellees.

I'Anson, J., delivered the opinion of the court.

On August 31, 1962, Allan Mortimer Hirsh, Jr., trustee, and State Planters Bank of Commerce and Trusts, as substituted trustee, of the trust created under the will of John Hughson Hirsh, deceased, filed a bill of complaint alleging that they are holding 89,223 shares of common stock of Lock Joint Pipe Company in the trust created by the testator; that under the provisions of paragraph Fifth B(4) of the testator's will they are prohibited from selling, transferring or exchanging the Lock Joint stock without the approval of certain beneficiaries of the trust; and that on or about October 1, 1962, Lock

Joint Pipe Company will merge with Gladding,[1] McBean & Company to form the International Pipe and Ceramics Corporation, known as Interpace. The trustees prayed that the chancellor decree (1) that the provisions of paragraph Fifth B(4) of the testator's will be held inapplicable to the Interpace stock they will receive in exchange for Lock Joint stock; and (2) that they have the authority to sell, transfer and exchange, from time to time, the Interpace stock issued after the merger, as they may deem to be in the best interest of the beneficiaries of the trust.

All the beneficiaries under the trust filed answers either in their proper person or by their guardians ad litem. The testator's widow in her answer united in the prayer of the bill.

On June 1, 1967, the chancellor entered a decree, in accordance with his written opinion filed on October 21, 1963, holding that the provisions of paragraph Fifth B(4) of decedent's will, prohibiting the sale, transfer or exchange of the Lock Joint Pipe Company stock is not applicable to the stock of Interpace, into which Lock Joint has now been merged, because the Interpace stock is not substantially equivalent to the Lock Joint stock; and that the trustees have the authority to sell, transfer and exchange, from time to time, the Interpace stock now held by them as they may deem to be in the best interest of the beneficiaries of the trust. We granted an appeal to Philip Reid Hirsh, III, and Glenn Scutter Hirsh, two of the infant parties defendant and beneficiaries under the trust.

The testator died without issue on June 7, 1957. By his will, executed on January 23, 1957, after disposing of certain tangible personal property and real estate and leaving $300,000 to his widow, the remainder of his estate was left in trust with the income therefrom to the widow for her lifetime, and at her death the income to be paid to eight of his named nieces and nephews, or the children of any of his deceased named nieces and nephews, who shall take their parents' share *per stirpes*, and not *per capita*. When the youngest niece or nephew shall have obtained the age of 21 years, then the trust shall be terminated and the corpus distributed equally among the beneficiaries.

Paragraph Fifth B(4) of the will reads as follows:

"(4) I direct my Co-Executors and Co-Trustees not to sell, transfer, or exchange the said shares and stocks of the Lock Joint

---

[1] In the briefs "Gladding" sometimes appears as "Gladden."

Pipe Company unless a majority of the beneficiaries, who will ultimately receive the *corpus* of the trust should at any given time, who are then *sui juris*, direct, authorize, and empower in writing my Co-Executors and Co-Trustees so to do."

At the time of the hearing in the court below only one of the nieces or nephews named under the trust had attained the age of 21.

Effective September 27, 1962, Lock Joint, a New Jersey corporation, and Gladding, McBean & Company, a California corporation engaged in manufacturing clay pipe, merged with Electro-Chemical Engineering & Manufacturing Company, a Delaware corporation and wholly owned subsidiary of Lock Joint, and the name of the merged corporation became International Pipe and Ceramics Corporation (Interpace).

Incident to the merger, the 89,223 shares of Lock Joint stock held in trust under the provisions of the testator's will, were exchanged for 89,223 shares of Interpace common stock.

Lock Joint was founded by testator's father in 1905. At the time of testator's death on June 7, 1957, Lock Joint was, and since its formation had been, engaged solely in the business of manufacturing cement pipe, primarily used in the water and sanitation fields. The company's operations were confined to the eastern area of the United States. After the testator's death and before the merger, Lock Joint had acquired eight companies with different lines of businesses. As a result of such acquisitions and the merger, Interpace became engaged in the business of manufacturing plastic pipe and fittings; adhesives, paints and coatings, as well as plastic glass-reinforced products; ceramic tile and veneers; dinner ware; refractory brick for steel and glass industries; brick for use in the construction field; corrugated metal pipes; technical ceramics, such as nose cones for missiles, raydomes and products for the electronics industry where high alumina ceramics are required; prefabricated building slabs; clay pipe; and cement pipe. Interpace's operations then extended from coast to coast.

At the time of the death of the testator the capital structure of Lock Joint showed approximately 10% in preferred stock and long term debt and 90% in common stock. The preferred stock was valued on the company's books at $719,600 and the common stock at $24,382,614. The long term debt was $2,075,000. The Hirsh family voting control was 49%.

Immediately preceding the merger, on September 27, 1962, the

long term debt of Lock Joint was $10,000,000. There was no preferred stock but there were 1,843,938 shares of common stock outstanding, with a value of $38,256,605. The Hirsh family voting control had been reduced to 30%. Upon the merger, Interpace exchanged 1,843,938 shares of its common stock for the same number of Lock Joint shares. The value of the new shares was $33,719,938. Interpace also issued 334,227 shares of preferred stock, with a book value of $33,422,700, to the stockholders of Gladding, McBean. Its long term debt was increased to $16,118,000. The Hirsh family voting control was reduced to 22%.

At the time of testator's death Lock Joint had about 250 stockholders. Its stock was selling at three to four times its earnings and one-half of its book value. After merger and at the time of the hearing in the court below, Interpace stock was actively traded on the New York and Pacific Coast stock exchanges and was selling at twelve to fourteen times its earnings, at double its book value, and there were approximately 6,000 stockholders.

In 1957 Lock Joint had nine directors, three of whom were in the non-management or non-employee category. At the time of trial there were fifteen directors of Interpace, nine of whom were in the non-employee or non-management category.

The precise question before us is whether the provision in testator's will prohibiting the sale, transfer or exchange of Lock Joint stock is applicable to the Interpace stock.

The principle involved is one of first impression in Virginia. The vast majority of jurisdictions which have considered the matter have adopted the rule that where a trustee is authorized or directed to retain the shares of stock of a certain corporation as a part of the trust property and the corporation is later merged into or with another corporation, the trustee is ordinarily under a duty to receive and retain the new shares if they are substantially equivalent to the old ones. On the other hand, if the new shares are substantially different from the old ones, the trustee has the power to sell them. *Mertz* v. *Guaranty Trust Co. of New York*, 247 N. Y. 137, 159 N. E. 888, 57 A.L.R. 1114 (1928); *In re O'Brien's Trust*, 138 N.Y.S. 2d 221 (1955); *In re Hoyt's Estate*, 47 N.Y.S. 2d 929 (Surr. Ct. 1943), *aff'd*, 268 App. Div. 1002, 52 N.Y.S. 2d 116, *modified on other grounds*, 294 N. Y. 373, 62 N. E. 2d 609 (1945), *rehearing denied*, 294 N. Y. 979, 63 N. E. 2d 712 (1945); *In re Muellers' Trust*, 28 Wis. 2d 26, 135 N. W. 2d 854 (1965); *In re Riker*, 124 N. J. Eq. 228, 1 A. 2d 213 (1938), *aff'd*,

125 N. J. Eq. 349, 5 A. 2d 685 (1939). See also, 3 Scott, Trusts, § 231.4, pp. 1890-1892 (3d ed. 1967); Bogert, Trusts and Trustees, § 683, pp. 342-347 (2d ed. 1960); Annot., Fiduciary—Retention of Investments, 47 A.L.R. 2d 187, §§ 10 and 12, pp. 231-236, 240-248 (1951); Restatement (Second) Trusts, § 231, comment f. (1959).

To determine whether the new shares of stock in Interpace are substantially equivalent to the old ones in Lock Joint, we must consider the sphere of activity, products manufactured, and the capital structure of the two corporations.

The leading case on the subject is *Mertz* v. *Guaranty Trust Co. of New York, supra.* There the grantor transferred 100 shares of common stock of Shuttleworth Brothers Company in trust, with the income to his daughter for life, with remainder over. No power of revocation was reserved by the grantor and no power of sale conferred on the trustees. Seven years later Shuttleworth was merged with another corporation, McCleary, Wallin & Grouse, acquiring the name of Mohawk Carpet Mills, Inc. Of the Mohawk common stock, 80,000 shares went to Shuttleworth stockholders, and 120,000 to the stockholders of McCleary. There was also an issue of $1,000,-000 of preferred 6% stock which was transferred to McCleary stockholders. The original 100 shares of Shuttleworth Corporation were exchanged for 800 shares of Mohawk. The trustees then sold the 800 shares of Mohawk, and the beneficiaries sued to compel the restoration of the trust and prevailed in the lower court. On appeal, the case was reversed, and Cardozo, C.J., speaking for the court, said:

"We think the identity of the Shuttleworth shares was ended by the merger, and that the trustee had the power to sell what was acquired as a substitute. 'Every case of this sort must be looked at on its merits in order to see whether the investment is the same.' * * * Here the investment is radically different. The change of identity has relation not to form only, but to substance. The tale is only partly told when we say that the consolidated corporation is a new juristic person. It is that, but it is something more. The shares have been issued in new proportions and classified in new ways, as common and preferred. The old investment has has been subordinated to alien priorities. The ancient venture has exposed itself to strange and unexpected hazards. The finding is that there has been a change in the 'product manufactured,' the 'marketability of the product,' the 'capital structure,' the 'risks

and vicissitudes,' both actual and probable. * * * The dividends to be garnered by fostering the one might be altogether different from those to be garnered by fostering the other." 159 N. E. at 889.

In the annotation in 47 A.L.R. 2d at 245, *supra*, it is said:

"Where the new or successor corporation not only has a different capital structure but also additional or altered products to sell, these factors are important indications that the new securities are not within the scope of a clause which authorizes or directs the retention of the stocks of the original corporations." Citing, *Mertz, supra,* and *In re Palmer's Will*, 132 N.Y.S. 2d 311 (Surr. Ct., 1954).

Applying the rationale of *Mertz, supra,* we are of opinion that the Interpace stock is not substantially equivalent to the Lock Joint stock, and the provision in testator's will prohibiting the sale, transfer or exchange of Lock Joint stock is not applicable to Interpace stock. The shares of Lock Joint have been "subordinated to alien priorities." Not only did the entire issue of 334,227 preferred shares, with a book value of $33,422,700, go to the former stockholders of Gladding, McBean, but there was also an increase of approximately 61% in long term debt. The book value of stockholders' equity in Lock Joint stock was also reduced from $38,256,605 to $33,719,839 upon the merger of the two companies. Lock Joint's principal business was manufacturing concrete pipe; whereas Gladding, McBean was engaged in the manufacture of clay pipe, which is a substantial part of Interpace's business. Thus not only did the new corporation have a vastly different capital structure but it also had an additional product to manufacture and sell. While the potential earnings of Interpace may be greater, the company is also subject to greater "risks and vicissitudes." The difference between the shares of the two companies is substantial, and the changes go not to form, but to the substance of the investment.

For the reasons stated, the decree is

*Affirmed.*